# RICHARD J. BIGGS & CO. *vs.* E. LANGHAMMER
## ET AL.

*Evidence—Offer to Compromise Claim—Usage as to Authority of Ship-Brokers—Breach of Charter Party—Measure of Damages—Death of one Joint Contractor After Action Brought.*

Evidence of an offer by a party to compromise his claim, which was not accepted, is inadmissible.

The fact that a party gives certain reasons for his willingness to compromise his claim against the defendant, which are not good, does not render the offer competent evidence against him.

Held that a letter from plaintiff to defendant was a *bona fide* offer to compromise a controversy and not an attempt to extort money upon an unfounded claim.

The evidence in this case was legally sufficient to prove the existence of a general usage at the port of Baltimore by which ship brokers are authorized to charter a vessel without ratification of their act by the master of the vessel, and it should have been left to the jury to determine whether such usage existed or not.

In an action for breach by defendant of a contract to carry in his vessel from Baltimore to a southern port, four thousand bushels of corn at a certain time, the measure of damages is the difference between the market value of the corn in Baltimore and its market value at the southern port at the time it should have been delivered, less freight and cost of loading.

When plaintiff's evidence in an action for breach of a charter party was that he agreed to ship from three to four thousand bushels of corn and defendant's evidence was that in the negotiations between plaintiff and

the ship brokers no definite quantity was mentioned, it is error to instruct the jury, at the instance of the defendant, that their verdict must be for him, unless they are satisfied that the plaintiff made a contract for the shipment of a definite quantity of corn. Such an instruction is apt to mislead the jury unless connected with an instruction based upon the plaintiff's evidence.

When a contract is made by two or more persons jointly and one of them dies, the action on the contract must be brought against the surviving contractors and it is error to make the executor of the deceased contractor a co-defendant.

Appeal from the Superior Court of Baltimore City (BAER, J.)

*Plaintiff's 1st Prayer.*—If the jury find from the evidence that on or about the 30th day of April, 1901, John H. and Earnest Langhammer and one Robert McClintock, deceased, were the owners of the schooner "Robert McClintock," and that on or about the said date, the said owners through their duly authorized agents or brokers, entered into an agreement with the plaintiff to convey by means of said schooner "Robert McClintock" from three thousand to four thousand bushels of corn from Baltimore, Maryland, to Georgetown, South Carolina, in consideration of the freight of three cents (3c.) per bushel, said vessel to leave Baltimore for Georgetown on or about the 3rd day of May, 1901; and if the jury further find that the plaintiff, in due time, was able and willing to deliver four thousand bushels of corn to said schooner, to be conveyed as aforesaid, but that the said owners or their agents notified the plaintiff that the said schooner had secured another cargo, and thereupon without default on the part of the plaintiff failed to receive and convey said corn to Georgetown, then their verdict must be for the plaintiff. (*Granted.*)

*Plaintiff's 2nd Prayer.*—If the jury find from the evidence that on or about the 30th day of April, 1901, John H. and Ernest Langhammer and one Robert McClintock, deceased, were the owners of the schooner "Robert McClintock," and that on or about said date, the said owners or their duly authorized agent, the captain of said schooner notified Messrs.

Wathen & Hooper, their ship brokers (if the jury find that Wathen & Hooper were at that time the ship brokers of the said owners) of the arrival of said schooner at Baltimore, and requested them to secure a load or cargo for said schooner to Georgetown, South Carolina; and if the jury further find that in April and May, 1901, there was prevailing at the port of Baltimore, a well-known and recognized custom or usage whereby ship brokers such as Wathen & Hooper, upon a notice and request similar to the above, exercised full authority to finally close for the carriage of general merchandise by schooners such as the "Robert McClintock," to ports such as Georgetown, South Carolina; and if the jury further find that in pursuance of such custom or usage, the said Wathen & Hooper closed with the plaintiff for the carriage of from three thousand to four thousand bushels of corn by the schooner "Robert McClintock" from Baltimore, Maryland, to Georgetown, South Carolina, in consideration of the freight of three cents (3c.) per bushel, said vessel to leave Baltimore for Georgetown on or about the 3rd day of May, 1901; and if the jury further find that the plaintiff, in due time, was able and willing to deliver four thousand bushels of corn to said schooner, to be conveyed as aforesaid, but that the said owners or their agents notified the plaintiff that said schooner had secured another cargo, and thereupon without default on the part of the plaintiff failed to receive and convey said corn to Georgetown, then their verdict must be for the plaintiff. (*Refused.*)

*Plaintiff's 3rd Prayer.*—If the jury find the facts set for thin the plaintiff's first prayer, and further find that after the plaintiff was notified that owners of said schooner "Robert McClintock" were not going to receive and convey his corn to Georgetown, South Carolina, as agreed, he used reasonable diligence in endeavoring to make shipment of said corn to Georgetown by other means, but was unable to make said shipment on reasonable terms, then the jury may arrive at the amount the plaintiff is entitled to recover in this action by deducting the market value at Baltimore on or about May the 1st, 1901, of four thousand bushels of corn of the kind con-

tracted to be conveyed, from the market value of said corn at Georgetown, South Carolina, at or about the time the jury may find said corn°would have arrived there if it had left Baltimore on May the 3rd, 1901, as agreed, and by further deducting the freight of three cents (3c.) per bushel on said corn, and whatever the jury may find it would have cost the plaintiff to have delivered said four thousand bushels of corn on board said schooner at Baltimore. And the jury may, in their discretion, give interest upon the amount to which they may find that the plaintiff is entitled. (*Granted.*)

*Defendant's 1st Prayer.*—The jury are instructed that unless they are satisfied from the evidence that the plaintiff had a contract with Wathen & Hooper for the shipment of a definite quantity of corn on the schooner Robert McClintock, from Baltimore to Georgetown, S. C., their verdict must be for the defendants. (*Granted.*)

The cause was argued before McSHERRY, C. J., BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*Charles T. Bagby*, for the appellants.

*Robert H. Smith*, for the appellees.

PEARCE, J., delivered the opinion of the Court.

The plaintiff in this case is a buyer, seller and shipper of grain, trading as Richard J. Biggs & Company, and has been engaged in that business in the city of Baltimore for thirty years. The defendants, John F. Langhammer and Ernest Langhammer, trading as E. Langhammer & Son, and Robert McClintock, now deceased, were the owners of the schooner Robert McClintock, and this suit was brought against them to recover damages for the breach of an alleged contract to carry for the plaintiff a cargo of corn from Baltimore to Georgetown, South Carolina. After the institution of that suit, Robert McClintock died, and upon suggestion of his death, his executors, Robert N. McClintock and Walter R. Town-

send, were made parties defendant. This will be adverted to later on.

The declaration alleges that Wathen & Hooper, being ship brokers, and agents for the schooner Robert McClintock and her owners, contracted in behalf of the defendants with the plaintiff to carry on said schooner from Baltimore to George-town from 3,000 to 4,000 bushels of corn in consideration of a freight charge of three cents per bushel; said freight to be paid on delivery of the corn at Georgetown; and the schooner, laden with said corn, to sail on or about May 3rd, 1901.

The defendants pleaded separately the general issue, and the verdict and judgment being for the defendants, the plain-tiff appealed.

There are three bills of exception in the record, the first and second being to the admission of certain evidence, and the third to the ruling upon the prayers. The plaintiff, to sustain the issues on his part, introduced testimony to prove the facts alleged in the declaration. He testified himself that in the latter part of April, 1901, he went to the office of Wathen & Hooper, who were ship brokers, and agents for the schooner Robert McClintock and entered into an agreement with them to carry for him on the said schooner, then in the port of Bal-timore, from 3,000 to 4,000 bushels of corn to the port of Georgetown, South Carolina, for three cents per bushel, the schooner to load and sail in a few days, and that the contract was then closed on the terms stated, with said Wathen; that he had an option on a quantity of corn then stored in an ele-vator in Baltimore, and was ready and able and willing to close said option and to ship 4,000 bushels of corn as agreed upon, but that early in May, 1901, Wathen & Hooper notified him that Captain Lewis, master of the schooner Robert McClin-tock, had thrown up his charter and had gone to the West Indies for fruit; that he endeavored unsuccessfully to secure another vessel to take this corn; that he ascertained the rate on corn by rail to Georgetown, but found it so high as to be prohibitory; that the market price of corn in Baltimore on May 3rd, 1901, was 47½ cents per bushel, at which price he

had secured his option on the 4,000 bushels to be so shipped; that it was his business to keep posted as to the corn market generally, including Georgetown, South Carolina, and that on May 10th, 1901, the market price there was 60¾ cents per bushel, and that it varied very little there for ten days preceding; that it cost 2½ to 3 cents per bushel to sack and deliver corn on vessel in Baltimore; and that he never did succeed in getting any part of this 4,000 bushels of corn to Georgetown. He further testified that he had chartered a great many vessels in Baltimore, and that the general custom among ship brokers was to close charters without referring them to the master of the vessel for his approval.

On cross-examination he said he had not actually sold the 4,000 bushels of corn on which he had an option, but had written his agent at Georgetown, B. A. Munnerlyn, to sell the same on its arrival, at the then market price.

The plaintiff further proved by Munnerlyn, that he had been in the grain commission business at Georgetown for ten years, that corn sold there during May, 1901, as high as 65 cents per bushel, and that he could have sold all the corn plaintiff could have shipped him between May 5th and 25th, 1901, at 60¾ cents per bushel.

He further proved by Robert D. Wathen, a member of the firm of Wathen & Hooper, that his firm, about the last of April, 1901, entered into an agreement with the plaintiff to carry corn to Georgetown on the schooner McClintock at three cents per bushel, but that he did not remember the quantity specified; that his firm had trouble with Captain Lewis over his failure to take the corn as agreed on, and the vessel was taken out of their hands and handled by another broker until sometime in 1905, when she was again placed in their hands; and that it usually took the McClintock about one week to make the voyage from Baltimore to Georgetown.

Mr. Hooper, the other member of the firm of Wathen & Hooper, testified that there were negotiotions between his firm and plaintiff for carrying corn to Georgetown by the McClintock, and that plaintiff may have secured the vessel, but he

could not be positive, and does not remember that any definite
quantity of corn was specified.　He also said the usual cus-
tom of brokers is to refer the charter to the captains before
closing finally.

Plaintiff further proved by Luther H. Gwaltney that he is
the manager of the American Lumber Company and has been
in the lumber business in Baltimore for over twenty years, and
always understood that the custom here was for ship brokers
to finally close charters without referring them to the captains
for ratification.

Captain Lewis for the defendants, testified that he never
gave Wathen & Hooper authority to charter for less than
5,000 bushels of corn; that nothing was said about the quan-
tity of corn, "whether there was ten, fifty, one hundred or one
thousand bushels, not a word," though in another part of his
testimony he had said that Mr. Hooper told him there were
2,000 bushels belonging to Mr. Biggs to be shipped; that
"the brokers as a general thing are agents for the vessels, but
before they close anything they generally consult the captain;
that is the way I have been running the vessel, they never
closed the vessel until they saw me."

The defendant, John H. Langhammer, testified that his firm
and Robert McClintock were owners of the schooner McClin-
tock, but that he had nothing to do with her chartering;
turned that all over to the captain and his brokers; that his
firm received from Mr. Biggs the letter dated May 6th, 1901,
offered and admitted in evidence over the objection of the
plaintiff; also that he met Mr. Biggs sometime in May, 1901,
after the breach of the alleged charter on South street, and
that Mr. Biggs told him Wathen & Hooper had agreed to take
2,000 bushels of corn for him by the McClintock to George-
town, and at the same time said he had better send him $50
and call it square.　This statement was objected to by plain-
tiff, and was admitted over his objection.　Plaintiff testified
that when Langhammer said he mentioned 2,000 bushels of
corn as the quantity to be carried, he was mistaken and con-
founded sacks with bushels, 2,000 sacks being equal to 4,000

bushels, and that he, plaintiff, never told him the quantity was 2,000 bushels.

The letter of May 6th, 1901, above-mentioned, will be transcribed in full and is as follows:

"Messrs. E. Langhammer & Son,
              Managing Owners Sch. Robert McClintock,
                            2112 Aliceanna St., City.

Dear Sirs:—We like to be neighborly about these matters, and yet, when we make sharp losses through no fault of our own, we cannot help feeling greatly disappointed.

The brokers, Messrs. Wathen & Hooper, engaged with us for vessel's account, the schooner McClintock to load general cargo for Georgetown, commencing on Friday, *May 31st.* We obligated ourselves to deliver grain, &c., to Georgetown, and to our own surprise the captain tells us he has chartered elsewhere, and hence cancels his Georgetown charter.

If our customers institute proceedings against us, our loss will be several hundred dollars, and may, in fact, be much more than this, but if we can settle the matter amicably and pleasantly with you, we would much prefer doing so to filing claim for damages and charges against the vessel and owners, and therefore, subject to your prompt acceptance and prompt payment, we will accept in lieu of all claims against the vessel as above-mentioned, for the cancelling of its charter, the reduced amount of say, $40 to $50, which offer we make out of respect to you, and in spirit of neighborly courtesy. Please let us hear by two o'clock.

As a merchant, you will understand that the position in which we have been placed ruins a man's business as well as brings pecuniary loss.

Of course if you decline this, and we are forced to consider the matter on a different basis, we would have to ask our full damages.

              With much respect,
                            Very truly yours,
                                   Richard J. Biggs & Co."

At what wharf is McClintock lying?

The date May 31st, mentioned in the body of this letter as the time to commence loading, was obviously meant for April 31st, from all the testimony in the case, and needs no further explanation

The first exception was to the admission of this letter in

evidence, and the second exception was to the admission of Mr. Langhammer's testimony as to the plaintiffs telling him he had better pay $50 and call it square.    These exceptions present the same question, and will be considered together.

It does not appear from the record upon what principle the Court admitted what the plaintiff claims to have been, and what upon its face appears to be, an offer of compromise, but it may be inferred from the brief of the appellee, that the Court adopted the argument of the appellee that it was not an offer of compromise in good faith, of a claim which the plaintiff believed to be good and valid in law, but an effort to extort money upon a pretended claim, known by the plaintiff to be without foundation.

The construction of this letter was for the Court to determine, and if it be construed as a *bona fide* offer of compromise, it is clear upon all the authorities, that as it was not accepted, it was not properly admissible in evidence.

The rule is well settled that "offers by a party with a view to compromise, to pay or to accept a sum of money, or to make deductions, and in general to secure a settlement, are inadmissible," and though there are some cases which hold that such offer is admissible, unless stated to be without prejudice, yet the prevailing rule is that the offer will be presumed to have been made without prejudice.    *Jones on Evidence,* sec. 293.    This is the rule in Maryland.    *Reynolds* v. *Manning,* 15 Md. 526; *Calvert* v. *Friebus,* 48 Md. 46.    In the latter, attention is called to the distinction in this respect between such offers, and the admission of particular facts, in which case, unless expressly stated to be without prejudice, it was held there is no rule of law which would exclude the admission of a particular fact as against the party making it.

The reason for the general rule is nowhere better stated than in Mr. Wigmore's recent work on Evidence, sec. 1061, as follows: "The true reason for excluding an offer of compromise is that it does not ordinarily proceed from *and imply a belief that the adversary's claim is well founded;* but rather a belief that the further prosecution of that claim, whether well

founded or not, would in any event cause such annoyance as is preferably avoided by the payment of the sum offered. In short the offer implies merely a desire for peace, not a concession of a wrong done." While this passage, in its verbal form, refers to offers of compromise from a defendant, it is obvious that it relates as well to the claim of a plaintiff as to the defense of a defendant, since in either case the offer to pay a part, or abate a part, of the sum claimed, equally implies a desire for peace, and wrong is done as well by the presentation of a claim known to be unfounded, as by the resistance of a claim known to be just.

There is in this letter no admission of any particular fact, which the defendant, under the exception stated, would be entitled to have received in evidence, and we are therefore brought back to the inquiry whether this is a *bona fide* offer of compromise, or, as suggested by the appellee, an attempt to extort money upon an unfounded claim. This suggestion seems to be based upon the admission of the plaintiff in his testimony that he had not actually sold the 4,000 bushels of corn upon which he had an option, and the statement in his letter that if his customers instituted proceedings against him, his loss might be several hundred dollars. But we do not think this justifies that conclusion. If the plaintiff, in fact believed that he had a good and valid cause of action, even though the result of litigation might have shown he had not, his offer of compromise would not have been admissible in evidence· That he gave reasons for his offer, which perhaps were not the best that he could have given, cannot in any manner affect the legal principle upon which such offers are excluded. There was evidence tending to prove the alleged contract. The uncontradicted evidence shows he was prepared to ship 4,000 bushels of corn by the McClintock at the time agreed upon, and that there was a net profit to him on such shipment of about seven cents per bushel, or $280, since the proof was clear that this corn, if shipped, would have been sold for 60¾ cents per bushel at any time between May 5th and 25th. A recovery was allowed in a very similar case in *Dambmann*

v. *Lorentz & Rittler*, 70 Md. 380.   It was immaterial whether
the corn was actually sold or not, or whether any customer
could institute proceedings against him for any failure to de-
liver corn.   This consideration could not affect a loss actually
incurred, irrespective of any such proceedings, by the failure
of the defendant to carry this corn, which the proof shows
never was carried by any one for the plaintiff.

We can therefore find nothing upon the face of this letter
itself, nor in the surrounding circumstances, which would jus-
tify us in the conclusion that the plaintiff was attempting to
practice a fraud upon the defendant by offering to compro-
mise a claim which he knew had no basis either in law or in
morals.

The verbal offer of compromise followed the letter, and is
necessarily governed by the same principle, and for the rea-
sons stated, we are of opinion that both were erroneously ad-
mitted.

We can perceive no ground upon which it can be con-
tended that the plaintiff was not injured by this erroneous ad-
mission of evidence.   As was said in *Smith* v. *Satterlee*, 130
N. Y. 677.   "It is not seen how this Court can determine
what effect it had on the mind of the referee who admitted it
as evidence and then refused to strike it from the record.
Presumably it was considered in connection with the other
evidence which induced a finding favorable (in that case) to
the plaintiff.   The judgment should be reversed."

·A very similar case is *Barker* v. *Bushnell*, 75 Ill. 222, in
which the Circuit Court admitted propositions made by the
plaintiff to settle the matter for much less than the value of
the corn in controversy, which was the subject of an action of
replevin, in which the Supreme Court said, "such evidence
was clearly inadmissible," and that "the case ought therefore
to be submitted to another jury without the objectionable ev-
idence which may have misled them.'"

Coming now to the third exception, we think there was
error in rejecting the plaintiff's second prayer. .

Being a rejected prayer, however, it was not necessary in

order to secure its consideration in this Court, that a special exception should have been filed on the ground that there was no evidence legally sufficient to sustain the prayer.    *Albert* v. *State*, 66 Md. 334; *Gunther* v. *Dranbauer*, 86 Md. 1.

There was distinct conflict of testimony as to the existence of a usage authorizing ship brokers to close a charter without reference to the master of a vessel, but this conflict, if the evidence was otherwise sufficient to establish the usage, was for the jury to determine.    The evidence upon the part of the plaintiff was of a general uniform usage.    That on the part of the defendant, was confined to the experience of the master of the McClintock.    The plaintiff supported the usage in all cases by the testimony of himself, Mr. Wathen, a ship broker, and Mr. Gwaltney, a large shipper of lumber.    The defendants denial of the usage rested solely upon the testimony of Captain Lewis as to his individual mode of dealing,

If the evidence as offered, lacked any of the elements requisite to establish a usage, its admission should have been then excepted to, but being in, without objection, it must be considered by the jury under proper instructions from the Court.    This is not a case where it can be said no legally sufficient evidence has been offered.    If such a usage did exist, it is settled that "one who deals in a particular market must be taken to deal according to the custom of that market, and he who directs another to make a contract at a particular place must be taken as intending that the contract may be made according to the usage at that place."    *Kraft* v. *Fancher*, 44 Md. 216.

The plaintiffs first prayer required the jury to find actual affirmative authority to close the charter, while the second prayer dispensed with actual authority, and relied upon the usage as constructive authority.    It is manifest therefore that the latter is not a mere substitute for the former prayer, and that it gives the plaintiff a standing with the jury not given by the first prayer.

The measure of damages in event of a verdict for the plaintiff we think was correctly laid down in plaintiff's third prayer.

The record does not show, that the defendants' first prayer was granted in connection with the plaintiffs' first prayer as is stated in appellees' brief, and without being so connected we think it was calculated to mislead the jury, leaving them in doubt whether the quantity of corn stated in the plaintiff's first prayer "from 3,000 to 4,000 bushels" was, or was not *"a definite quantity."* If it had been granted distinctly in connection with plaintiff's first prayer, we should feel, under the authority of *Garey* v. *Sangston*, 64 Md. 38, that it should not mislead a jury of ordinary intelligence.

At common law, in case of a joint contract, if one of the joint contractors died, an action at law could not be brought against his executor or administrator, but against the surviving contractors only; and if the contract was several or joint and several, the executor or administrator of one could be sued separately, but not jointly, with the survivors; the reason being that the same judgment cannot be rendered against the survivor and the personal representative, because one is to be charged *de bonis propriis* and the other *de bonis testatoris.* 18 *Cyc.*, 960. Death in such case severs the cause of action. *Poe's Pleading*, sec. 401; *State, use of Ranstead*, v. *Banks*, 48 Md. 520. There is no statute in Maryland altering the common law doctrine as applicable to joint and several contracts, though our statute does provide that where two or more are jointly bound, and one of them shall die, his executors or heirs shall be bound as if the contract had been several as well as joint. The joinder of McClintock's executors therefore as parties defendants with J. F. and Ernest Langhammer, was an irregularity which should be corrected in any future proceedings.

> *Judgment reversed with costs to the appellants above and below, and a new trial awarded.*

(Decided February 13th, 1906.)