# THE ACKER, MERRALL & CONDIT COMPANY *vs.* GEORGE K. McGAW.

*Duty of Managing Director of Corporation—Renewal of Lease of Property Occupied by Corporation Taken by Director for Himself—Sufficiency of Evidence in Action Against Director for Breach of Duty—Prayer Too General—Evidence of Offer of Compromise—Bill of Exception.*

The managing director of a corporation occupies towards it a fidicuary relation, and it is a breach of duty for him to take in his own name, or in the name of others for his benefit, a lease of the premises occupied by the corporation, to begin upon the expiration of an existing lease, when the interest of the corporation requires that the renewal of the lease should be made to it. The director is liable to the corporation for a loss resulting directly from such breach of duty.

The defendant sold out his grocery business to the plaintiff, a New York corporation, and became its resident managing director. The lease of a store to the defendant at $8,000 a year, which expired on January 31st, 1906, was assigned to the plaintiff company, with the assent of the lessors. On October 24th, 1905, the lessors notified plaintiff of the expiration of the lease, and plaintiff thereupon requested the defendant to look into the matter of renewing the lease. In November, the plaintiff corporation learned that the defendant, on October 25th, had taken from the lessors a new lease of the premises for three years at $8,000 per year in his own name, and that he intended to go into the grocery business himself. Plaintiff caused the defendant to resign his position as director, and also to assign to it the lease. The lessors' assent was necessary to this assignment but they refused to assent, alleging that an offer of $9,000 per year had been made for the premises. This offer was made by A and B, two men who had been associated with defendant in business, and with whom he did subsequently go into business, and in their offer, he was the guarantor of the rent. The plaintiff company then took a new lease of the premises at $9,000 and brought this action to recover damages. *Held*, that the evidence is legally sufficient to authorize the jury to find that the defendant could have secured a renewal of the lease for the plaintiff company at the original rent, also that the offer by A and B was made in his interest or on his behalf; that the plaintiff was compelled to pay the higher rent in consequence of that offer, and that since these acts were in violation of the duty owed by the defendant as managing director to the plaintiff, it was error to instruct the jury that the plaintiff was not entitled to recover.

When a declaration contains in one count two distinct causes of action, and hence is open to the objection of duplicity, it may be amended upon the remand of the cause for a new trial.

A prayer is too general and indefinite which instructs the jury, "that the plaintiff, not having offered any evidence legally sufficient to support the material averments of the declaration, is not entitled to recover, and therefore the verdict shall be for the defendant." Such a prayer is not a demurrer to the evidence, but is directed to the failure of proof upon some point which is not disclosed.

Evidence of an offer made for the purpose of compromising a controversy, is not admissible in evidence, and evidence of a statement made in connection with such offer, as a reason why it should be accepted, is likewise inadmissible.

A single bill of exception should not embrace more than one question of law.

*Decided November 21st, 1907.*

Appeal from the Superior Court of Baltimore City (STOCK-BRIDGE, J., sitting as Court and jury.)

The amended declaration in the case was as follows:

The Acker, Merrall and Condit Company, a corporation created and existing under the laws of the State of New York, by Steele and Semmes, its attorneys, sues George K. Mc-Gaw:

(1.) For that, on or about the 28th day of February, nineteen hundred and three, and for some years prior thereto, the said George K. McGaw had been conducting a grocery business in the city of Baltimore, under the firm name and style of "George K. McGaw and Company," in certain premises in said city, known as numbers 220 and 222 North Charles street, which said premises the said George K. McGaw at that time held under a lease from Maurice Gregg, trustee under the last will of James Gregg, and Luther M. Reynolds and Maurice Gregg, trustees under the last will of John Gregg. That on the said 28th of February, nineteen hundred and three, the said defendant sold to the said plaintiff, all his interest in the grocery or cigar stores, which he was conducting in the city of Baltimore under the firm name and style of

"George K. McGaw and Company," one of which said stores was being carried on, on the premises, numbers 220 and 222 North Charles street, and all the goods, wares and merchandise of every kind and character whatsoever owned by the said defendant in connection with the stores aforesaid, together with the firm name, good will, fixtures and other assets upon certain terms, and for certain considerations, which terms were all fully complied with, and which said considerations were fully paid by the said plaintiff.    It was further agreed that the said defendant should enter into the employment of the said plaintiff, should devote all of his time and best business judgment to the plaintiff, should become one of its board of directors, and should be paid a salary of ten thousand dollars ($10,000) a year for a period of three years, accounting from April 1st, nineteen hundred and three.    That about April 1st, nineteen hundred and three, the defendant was made and constituted the resident and managing director of the plaintiff's business in the city of Baltimore.    The said defendant further agreed to assign the lease of the said premises to the said plaintiff.    That the said lease contained a condition that the said premises therein described should not be assigned or sublet without the consent of the lessors first had and obtained, and on or about the 16th day of May, nineteen hundred and three, the said defendant, having previously assigned to the plaintiff, all his right in the said premises described in the said lease, procured the assent of the said trustees to the said assignment.

· That the lease under which the said premises numbers 220 and 222 Charles street, had been held by the said defendant, expired on the 31st day of January, nineteen hundred and six. That on or about October 24th, nineteen hundred and five, the plaintiff received from the said trustees, notices to quit the said premises, numbers 220 and 222 North Charles street on the first of February, nineteen hundred and six.    That thereupon, towit, on the 25th day of October, nineteen hundred and five, the plaintiff wrote to the defendant, informing him of such notices and instructing and requesting him as plaintiff's managing director to immediately take up the matter of the said

lease with the said trustees. That the said defendant did not reply to the inquiry regarding the said lease in the said letter of October 25th, and although said defendant was in New York, he did not call to see the plaintiff about the said lease, and on the 28th of October, nineteen hundred and five, the plaintiff again wrote to the said defendant about the said lease, saying that its president would, if necessary, go to Baltimore to see what was best to be done about it. That not receiving any definite reply from the said defendant, the plaintiff again wrote him on November 8th, nineteen hundred and five, requesting him to at once take up the matter of the lease, and again offering to have its president to go to Baltimore, if necessary, to consult about the same. That the said defendant after the receipts of at least one of said letters was in New York, and saw the president of the plaintiff, and, although he was asked about the said lease, made no definite statement in regard thereto.

That on or about the 23rd of November, nineteen hundred and five, the said defendant was in New York, and was again asked by the president of the plaintiff what he thought should be done by plaintiff in regard to said lease, and said McGaw stated, that he wished first, to know what arrangement would be made about his own contract for services with plainitff expiring on April 1st, nineteen hundred and six, and that upon the president of plaintiff stating to said McGaw that the matter of the lease must first be settled, the said McGaw announced his intention of again going into the grocery business in the city of Baltimore in competition with plaintiff, and stated that he had procured in his own name a lease of the premises above mentioned, and that he had induced certain employees of the plaintiff to agree to leave the plaintiff's employ and enter in his employ, and he then offered to buy out the plaintiff's Baltimore store and business, which offer the plaintiff refused to consider. That on the 30th day of November, nineteen hundred and five, under instructions from plaintiff's board of directors, J. T. Harwood, assistant secretary of the plaintiff, saw the said McGaw in Baltimore, and in the name of the plaintiff, demanded

that he should at once assign the said lease to the said plaintiff, which the said McGaw then and there declined to do. That at said interview and thereafter, it transpired that the said McGaw had begun negotiations for the renewal of the said lease, more than a year or eighteen months prior to October, nineteen hundred and five, and that at the time the said letter of October 25th, nineteen hundred and five, was written by the plaintiff to the defendant, the defendant had agreed with the said trustees upon the terms for the renewal of the said lease, and that the said lease was then actually prepared and ready for execution, and was in fact executed in duplicate on or about the 28th day of October, nineteen hundred and five, whereby the said trustees leased the said premises to the said defendant for a term of three years at a rental of eight thousand dollars, ($8,000.00,) per annum, and that although this said lease had been renewed as aforesaid, and although the defendant saw the plaintiff, or certain of its officers after the said lease had actually been executed, and prior to the 23rd of November, nineteen hundred and five, as hereinbefore alleged, and although he received at least two letters urging the obtention of the said lease, after he had, as a matter of fact, obtained the same, the said defendant never told the plaintiff before the 23rd of November, nineteen hundred and five, that he had taken the said lease in his own name, but on the contrary, carefully suppressed and concealed the said fact from the plaintiff, That when the said defendant declined to assign the lease as aforesaid, the plaintiff employed counsel, who then made demand upon the defendant for an assignment of the said lease. That the counsel for the plaintiff were referred by the said defendant to his counsel. Whereupon the plaintiff's counsel demanded from the defendant's counsel, that the said lease should be at once transferred to the plaintiff, on the ground that the said defendant at the time he obtained the said lease was a director, and the managing or resident director of the said corporation, and therefore occupied a fiduciary relation towards it, and that he could not deal with the said property for his own benefit or in

his own behalf, and that he held the same, as trustee for the plaintiff, and that it would be a fraud upon the rights of the plaintiff for the defendant to refuse to assign said lease. That subsequently, on the same day, the said defendant, under the advice of his counsel, did assign the said lease to the plaintiff.

That the said lease contained a clause that the same should not be assigned without the consent in writing of the lessors first had and obtained.  That immediately upon the assignment of the said lease by the said McGaw, the said trustees were notified thereof by the plaintiff and were requested to assent to the said assignment, and a form of assignment was prepared by the plaintiff's counsel, and handed to the trustees for execution.  That the plaintiff heard nothing from the said trustees with regard to the said assignment until the 2d day of January, on which day its counsel was notified that the trustees did not approve of the assignment of the lease made by the defendant to the plaintiff.  That after a number of interviews with the said trustees, the plaintiff was informed by them that they had an offer of nine thousand dollars ($9,000.00), for the said property, and the trustees declined and refused to assent to the said assignment, or to lease the property to the said plaintiff at a lower rental than nine thousand dollars, ($9,000.00.)  That the plaintiff found upon inquiry, that a certain Frank N. Hopper and a certain James B. Warden, who had been associated with the defendant in his grocery business before the sale thereof to the plaintiff, and who had been employed by the plaintiff after the said sale to it by the said defendant, and who had been discharged from the employment of the plaintiff after the said defendant had been discharged therefrom, although the plaintiff continued to pay the salaries of the said Hopper and Warden after their discharge, were making the said offer of nine thousand dollars, ($9,000.00) per annum, to the said trustees for said property, and were saying that they would bid even more therefor, and that the said Hopper and Warden were acting for and in behalf of the said defendant.  This was discovered by the plaintiff about the 18th of January, nineteen hundred and six, and,

therefore, only about twelve days before the lease, under which the plaintiff was in possession of the property would expire.   That thereupon it wrote to the said defendant on the 19th of January, nineteen hundred and six, stating that the trustees were unwilling to consent to the assignment of the said lease by the defendant to the plaintiff, and that it assumed that the offer being made to the trustees, was made by the said defendant, and requested that the defendant would see the said T. J. Harwood, assistant secretary of the plaintiff, that day in Baltimore for the purpose of discussing the matter. That the said letter was sent by special messenger to the house of the defendant, but he made no reply thereto, and did nothing to secure said assent, but, on the contrary, did what he could in the manner already herein set out, to prevent the said trustees from consenting to said assignment.   That the ejectment of the plaintiff from the said premises on the 1st of February, 1906, by the trustees, would have made it practically impossible for it to have carried on its business for some months, and would have caused it a very great loss, and, therefore, by reason of the action of the said defendant, the plaintiff was forced to accept a lease from the said trustees and to agree to pay them a rental of nine thousand dollars, ($9,000.00) per annum for three years, instead of eight thousand ($8,000.00) per annum for three years, as had been agreed under the said lease obtained by the said McGaw in his own name while he was the resident and managing director of the plaintiff.   That by reason of said defendant George K. McGaw the plaintiff was subjected to and obliged to incur certain expenses in procuring a new lease of the said premises to wit, the sum of five hundred dollars in lawyers fees and traveling expenses in addition to paying a higher rent for said premises.

And the plaintiff claims ten thousand dollars, ($10,000.00) therefor.

Steele & Semmes,<br>Plaintiff's Attorneys.

The cause was argued before BOYD, PEARCE, SCHMUCKER, BURKE and ROGERS, JJ.

*John E. Semmes* and *Jesse N. Bowen*, for the appellant.

The jury could well find from the evidence that this offer of lease for $9,000 was made in behalf of the defendant, and for that purpose the testimony relating to the conversation with Lanahan is admissible.

Mr. McGaw's conduct was a fraud upon the plaintiff, and it is exteremely difficult in such cases to get very direct evidence when the testimony is to be obtained from the parties themselves who are charged with the fraud, and the Courts are disposed to be liberal in passing upon the question as to admissibility of evidence in such case.    *Cooke v. Cooke*, 40 Md. 522.

In the *Cyclopedia of Law and Procedure*, vol. 16, p. 949, we find "An offer of compromise may be admissible as relevant circumstantial evidence to prove a fact other than that of liability."    And again, p. 950: "Statements of facts independent of the concession involved in an offer of compromise are competent as admissions, since they are supposed to have been made because of belief in their truth, although such statements directly relate to a compromise offer, or were made pending compromise negotiations, or at an interview during which the terms of a compromise were discussed, or probably would not have been made at all except upon the assumption that they would facilitate a settlement, they are nevertheless admissible."

Lanahan had called up Harwood after the receipt of a letter which was written to McGaw calling upon McGaw to help procure the consent of the lessors to the assignment of the lease.    The objection, or the real reason for their refusal to consent was due to an offer made by Hopper and Warden, and it is claimed that this offer of Hopper and Warden was in fact made by or in behalf of McGaw, and at this interview Lanahan who stated that he was acting for McGaw, asserted that if a payment was made McGaw the offer of Hopper and Warden would be withdrawn.

The independent fact shown by this was that McGaw controlled Hopper and Warden's offer. *Beaudette* v. *Gagne*, 87 Me. 534; *Mayor & City Council of Columbus* v. *Howard*, 6 Ga. 213; *Gibbs* v. *Wright*, 14 Ala. 465; *Dungin* v. *Somers*, 117 Mass. 55; *Harrington* v. *Inhabitants of Lincoln*, 4 Gray, 463; *Sailor* v. *Hertzogg*, 2 Pa. St. 182; *Dickinson* v. *Dickinson*, 9 Met. 471; *American Digest*, 20 vol. Century Ed. sec. 751; *Reynolds Stevens on Evidence*, 38; *Hartford Bridge Co.* v. *Granger*, 4 Conn. 142.

The only statement not distinctly proved as set forth in the declaration is the statement that the offer of $9,000 made by Hopper and Warden was made while they were acting for and in the behalf of the defendant, the Court holding that this was not proven, and therefore the *allegata* and *probata* did not agree.

It is respectfully contended that this allegation is merely an aggravation of the offense of McGaw; that his fraudulent act for which he was responsible was the taking of the lease in his own name, and having taken it, and having refused to use his influence to get the consent of the trustees, he became at once responsible for a resulting loss; that it was not necessary to show that he participated in any way in the offer of Hopper and Warden.

1. The evidence, however, shows that he did, in fact, participate in this offer. Mr. Willis, in his cross-examination, states that he did not know the financial standing of Hopper and Warden, and that McGaw was offered as guarantor for the payment of the rent and the performance of the covenants of the lease. Aside from the testimony of Lanahan, which was ruled out by the Court, it is substantially proven that McGaw was, in fact, connected with this offer. Should the Court hold that there was an obligation to show that this offer of Hopper and Warden was, in fact, participated in by McGaw, it has been so shown. The fraudulent act of McGaw in this connection was participating in any way in the offer of Hopper and Warden. If he participated as guarantor, the trustees refusing to consider the offer unless the same was guaranteed,

it was just as much a want of good faith on his part as if the offer itself was directly made in his name or in his behalf.

It must be borne in mind that this is a suit *ex delicto* and not *ex contractu*. The strict rule which required the allegations to be verified by the proof has been very much relaxed, even where the suit is on contract, but where a suit is *ex delicto*, from the nature of the case this rule is not so strictly observed. In the case of a contract it is presumed that the plaintiff has all the facts before him; in *ex delicto* it is impossible to anticipate the exact character of proof to be offered, and all that is required is that the allegation should be substantially proved as laid. *Cook* v. *Gill*, 83 Md. 177.

Therefore, admitting for the sake of argument that the allegation made in the declaration that the offer of lease made by Hopper and Warden was made while they were acting for and in behalf of the defendant, had to be proven, it was substantially proven, inasmuch as the object of this allegation was to show that Mr. McGaw himself participated in this offer in one way or another, the breach of faith on his part being the fact that he did so participate. He did participate as guarantor.

2. The declaration sets forth a perfectly good cause of action without proving the fact that Mr. McGaw participated in the offer of lease made by Hopper and Warden.

(a) If it could be shown under this declaration that Mr. McGaw was in the employment of the plaintiff, that while so in the employment of the plaintiff he without notice to the plaintiff entered into negotiations with the trustees, or the lessors, with the view of procuring a lease in his own name, with the intention of going into business for himself at the expiration of his term, and that he did procure the lease in his own name, and that such action on his part resulted, in the opinion of the jury, in a loss to the plaintiff, then in that event the plaintiff is entitled to recover.

(b) If it could be shown that McGaw occupied the position of trust above set forth, and was a director of the company, that he negotiated the lease in his own name, and when called

upon to assign the same to the plaintiff declined to do so, but subsequently did so under pressure, and when called upon to use his influence to obtain the consent of the lessors to the assignment, positively declined to do so, and that by reason of such declination the jury should find that the trustees failed to give their consent to the assignment and there was in fact a resulting loss, then in that event the plaintiff was entitled to recover.

It is unnecessary to quote authorities at any length to establish the fact that Mr. McGaw, occupying the position of trust and confidence, receiving as he did $10,000 a year to represent the Company, it was a breach of his duty to take any action against the interest of the Company. *France on Corporations*, p. 128; *Clark & Marshall*, p. 2272-2290; *Gover* v. *Andrews*, 59 Cal. 119.

The facts already cited show that the first proposition as above set forth was abundantly established, and also the second, that Mr. McGaw not only took the lease in his own name when he could have procured it in the name of the company, but he claimed absolutely to control the trustees as to that assignment, and deliberately refused to aid in any way in procuring their consent to the assignment as made.

There is a question as to what would be the duty of a lessee who assigned a lease where there is a provision that the assignment in order to be valid must be approved by the lessors. Is it the duty in such cases for the assignor to procure the consent of the lessor? The authorities on this question are not altogether unanimous, but where as in this case there was an additional duty due by Mr. McGaw to rectify a wrong which he had committed in taking this lease in his own name, there can be no question that it was his duty not only to assign the lease, but to use his influence to procure the consent of the lessors. "Assignments," *Cyc.*, vol. 4, p. 83; 18 *A. & E. Ency.* 678; *Day* v. *Singleton*, (1899) 2 Ch. D. 320; *Williams* v. *Gluton*, L. R. 1 Ch. 208; *Engle* v. *Fitch*, L. R. 3 Q. B. 316.

3. The allegation that the offer of Hopper and Warden was

made while they were acting for and in behalf of Mr. McGaw was a mere surplusage, and should have been treated as such by the Court.   As above set forth, the case is a good one as shown in the declaration without this allegation.

*Frank Gosnell* and *Geo. Weems Williams*, for the appellee.

The *gravamen* of this suit is that Hopper and Warden in making the offer of $9,000 for the property *"were acting for and in behalf"* of the defendant.   The plaintiff, however, not only failed to prove that averment, but on the contrary, proved affirmatively first, that the defendant had nothing whatever to do with the offer; and secondly, that the trustees in demanding the higher rent were induced to do so because of changed conditions, and because of a duty which they considered they owed to their *cestuis que trustent.*

There is absolutely nothing in the record to show that the appellant had the *legal right* at any time to a lease of the property in its own name; if it had such right, or not having it, if the defendant owed any duty to it to procure the lease in its own name, it cannot be said that he could have procured it for $8,000 a year.   Mr. Harwood's evidence is that McGaw told him that Acker, Merrall & Condit Company could not have procured it.   Surely the appellant did not think so, or it would have put in execution its threat to Mr. Willis to file a bill in equity "for an interpretation of the lease as to whether or not that assignment of McGaw was operative notwithstanding the necessity of getting the consent of the trustee.   It is submitted in this connection that had there been anything in the lease expiring April 1st, 1906, that might have entitled the appellant to a renewal thereof in its own name, a bill in equity to compel the consent of the lessors to the assignment would have been the appropriate remedy.   *Baker* v. *Wainwright Bros.*, 36 Md. 353.

The defendant, having executed the assignment as prepared by Mr. Steele, counsel for the appellant, and his resignation having been requested and given, though under protest, he from that time owed no duty whatever to the plaintiff.   Mr.

Harwood made a proposition to the defendant that if he would execute an assignment of the lease and write a letter to the trustees requesting them to consent to the assignment the appellant would give him a release of his responsibility in connection with the matter. It appears from Mr. Willis' evidence, above quoted, that the trustees would not have given their assent and released McGaw, so that it is difficult to see how in any aspect of the case that what McGaw failed to do made him liable in any way to the appellant.

It is not, however, what the appelle failed to do that we are now dealing with, but that it is the failure of the appellant to prove its averments that Messrs. Hopper and Warden, in making their offer of $9,000 for the property, were acting as agents for McGaw. This is the averment in the *narr.* and it was absolutely necessary for the appellant to prove it before it was entitled to have its case submitted to the jury. We do not wish to be understood as admitting that even though their offer had been proven to be on behalf of McGaw, he would have been liable in this action, because we submit that he owed the appellant no duty whatever.

Referring again to the declaration, there is absolutely no evidence to show that the ejectment by the trustees of the appellant from the premises on the 1st of February, 1906, would have made it practically impossible for it to have carried on business for some months and would have caused it great loss, *non constat* but what the appellant could have secured as good or a better location in the city of Baltimore, at the same or less rent than $8,000 per annum. Moreover, there is no evidence that the appellant ever entered into possession under the new lease, and this suit was instituted February 28th, 1906, before any rent could have accrued under the lease.

An exception was taken to the ruling of the Court in "excluding the testimony of John N. Steele and J. T. Harwood, of the conversation had with Lanahan, who claimed to be counsel for McGaw, as set forth in the record."

Assuming this exception to be sufficiently definite, we find in Mr. Steele's evidence the following: "I went to see Lana-

han and he told me that the matter of the lease could be adjusted if the appellant would either renew its contract with McGaw or pay him the balance of his salary from the time of his resignation down to the time—I think it was the first of the following April—when his contract expired; that the approval of the trustees to the assignment of the lease at $8,000 a year would be obtained; I communicated with my client, and in consequence of the instructions I received from them I declined to enter into that arrangement."

(Motion made to strike out answer; granted; exception noted.)

If the exception can be tied up with the evidence of Steele and Harwood, above quoted and referred to, the exception is not well taken because at most it was but an offer to compromise a difference or dispute existing between the parties, and such offer after due deliberation between Steele and the appellant was rejected. This evidence merely tended to show an offer of compromise, did not tend to prove any issue, and therefore was clearly inadmissible.

If McGaw, being in the employ of the appellant, acted wrongfully in taking a renewal of the lease in his own name, there were three remedies open to the appellant: (1) It could have dismissed McGaw; (2) appellant had his action of law against him, or (3) appellant could have filed a bill for an injunction compelling an assignment and joining the trustees, could have compelled their consent (*Whitwood Chemical Company* v. *Hardman* [1891] 2 Ch. 425), and having dismissed the appellee for such alleged wrongful act, it is doubtful whether this action would lie had all the averments of the declaration been fully sustained by proof.

The appellant seeks to bring before this Court for review a *number* of exceptions to the rulings of the Court below by means of *one* bill of exceptions. In this *one* bill of exceptions the lower Court's action (1) in excluding certain testimony of John N. Steele, (2) in excluding certain testimony of Messrs. Steele and Harwood relating to certain conversations had by them on several separate occasions with Lanahan, (3) in grant-

ing a motion to strike out certain testimony admitted subject to exception, (4) in granting the appellee's prayer, is presented for discussion.    We submit that a bill of exceptions cannot contain more than one proposition of law.    2 *Poe, Pldg. & Prac.,* sec. 321; *Tall* v. *Steam Packet Co.,* 90 Md. 248.

BURKE, J., delivered the opinion of the Court.

The Acker, Merrall and Condit Company, a New York corporation, sued George K. McGaw in the Superior Court for Baltimore City.    The case was tried before the Court without a jury, and at the conclusion of the plaintiff's case the following prayer was offered by the defendant: "The defendant prays the Court to rule upon the evidence as follows: That the plaintiff not having offered any evidence legally sufficient to support the material averments of the declaration is not entitled to recover in this action, and, therefore, the verdict shall be for the defendant."    This prayer was granted, and a verdict and judgment entered for the defendant, and the plaintiff has appealed.    The form of the prayer will be noticed later.

It must be borne in mind at the outset that the Court is not to determine whether or not the evidence is sufficient to support the plaintiff's case.    We do not decide whether it is or not, and we are not to be understood as expressing any opinion upon that subject.    The question raised by this prayer must be determined as if the case had been tried before the jury, and if the case should have gone to the jury, had it been tried before one, the sufficiency in fact of the plaintiff's evidence was a matter exclusively for the jury to pass on.    The trial Judge has a certain duty to perform, and the jurors have another and different duty to discharge.

The Judge must say whether the plaintiff has offered any evidence legally sufficient to sustain the cause of action ; the jury must say, when all the facts have been submitted, whether they are of sufficient probative force to support the plaintiff's claim.    In the case in hand, it was an error to have directed a verdict for the defendant, if the record discloses any evidence legally sufficient from which the breach of duty on the part

of the defendant and the consequent damage alleged might have been reasonably inferred by a jury. It would be a serious inroad upon the province of the jury if, in any case, where there is evidence from which the facts sought to be proved might be reasonably inferred, the Judge should withdraw the case from the jury, because, in his opinion, the fact in issue ought not to be inferred. Upon the application of the defendant to take the case from the jury, the evidence adduced by the plaintiff must be assumed to be true, and it must be given the benefit of all legitimate and fair inferences deducible therefrom in its favor. The real question, therefore, before us on this prayer is, not whether the testimony offered proved the plaintiff's case, or whether a jury ought to have so decided had the case been submitted to them, but whether there was any legally sufficient evidence offered by the plaintiff from which a jury could properly find, if they believed it true, that the defendant was guilty of the wrongs alleged in the declaration.

The declaration need not be here transcribed, but the reporter is requested to set it out in the report of the case. It will be seen from an inspection of the declaration that the suit is grounded upon an alleged breach of duty on the part of the defendant as the managing director of the plaintiff by which, it is alleged, it was compelled to pay an increased rental for certain premises located at numbers 220 and 222 North Charles street, in the city of Baltimore, where the plaintiff was conducting business.

A person commits a tort, and renders himself liable to an action for damages, who commits some act not authorized by law, or who omits to do something which he ought to do by law, and by such an act or omission either infringes some absolute right, to the uninterrupted enjoyment of which another is entitled, or cause to such other some substantial loss of money, health or material comfort, beyond that suffered by the rest of the public. *Moak's Underhill on Torts*, 4. The two essential elements, therefore, necessary to sustain the action are (1) A wrongful act or omission of duty by the defendant; and (2)

Damage or loss to the plaintiff in consequence of such act, or omission. If the record discloses evidence tending to show a concurrence of these elements, the prayer should not under the rule stated, have been granted.

We will examine some of the salient facts which the plaintiff contends should have taken the case to the jury. Some of these are undisputed. It is not disputed that on or about the 28th day of February, 1903, the defendant, who had for a number of years conducted a grocery businees at 220 and 222 North Charles Street, sold his business to the plaintiff, and that the consideration for the purchase was fully paid; that it was further agreed that the defendant should enter into the employment of the plaintiff, and should devote all his time and best judgment to the conduct and management of the plaintiff's business in Baltimore, should become one of its Board of Directors, and should be paid a salary of ten thousand dollars a year for a period of three years accounting from April 1st, 1903; that the defendant was made the resident and managing director of the plaintiff's business in Baltimore; that the defendant agreed to assign to the plaintiff a lease of the Charles street premises, which he did, and that the lessors of the premises consented to the assignment; that this lease expired on January 31st, 1906, and that on the 24th of October, 1905, the lessors of the premises notified the plaintiff to vacate the property at the expiration of the lease. It is in evidence that the plaintiff in reply to this notice wrote to the lessors saying that its resident director, Mr. McGaw, would take the matter up with them at once. This letter was written from New York on October 25th, 1905, and on the same day the plaintiff wrote to the defendant and enclosed the notices to quit sent by the lessors to it. This letter was written by Mr. H. J. Luce, president of the plaintiff's company, and in referring to the expiration of the lease he wrote "This seems to have been overlooked by all of us, and I had no idea we were so near the end of our lease, or I would have had this matter taken up before." He then suggested to Mr. McGaw the question whether or not they should renew the

lease, or whether they should look around and see if they could improve their location.    He tells Mr. McGaw that the matter should be attended to at once, and that they should arrive at some definite conclusion as to what they should do. In response to this letter Mr. McGaw wrote that he had been in New York on private business, but did not have time to call upon the plaintiff, but said nothing regarding the lease.

On the 28th of October, 1905, Mr. Luce wrote another letter to the defendant, expressing his surprise at the defendant's not coming to see him while in New York, and said; "Now, I am waiting to hear from you regarding the lease, and if necessary I will go down to Baltimore to see what is best to be done about it."    Between October 28th and November the 8th, 1905, Mr. McGaw went to New York, and had an interview with Mr. Luce who testified as follows: "We had a general discussion about the business and conditions down here, and I said to Mr. McGaw, now we don't know anything about Baltimore, and the question we have got to attend to is the lease; it is your duty to go down and find out what we will have to pay for the renewal of this lease, and report as to whether it would be advisable to renew this lease and regarding the location, and make a general report to me so I can submit it to my board of directors; all those things have to go before our board; I said, if I can find time, I am very busy, but I would like to come down and spend a day going over the situation with you, but we are willing to abide by your judgment in the matter; he had absolute charge and we paid very little attention to the general management of the business, but it was entirely in his hands so far as the policy of the business was concerned.    At this interview Mr. McGaw did not say anything about having taken the lease in his own name.    Mr. McGaw in his letter of November the 7th, did not refer to the renewal of the lease; it was just a personal note written in regard to the renewal of our contract with him."

On the 23rd of November Mr. McGaw went to see Luce in New York.    He then stated that he controlled the lease,

and when asked what he meant by that stated that he was going back in the grocery business, and that he would buy the plaintiff out, and that he had taken the lease in his own name. Mr. Luce testified as follows: "I said, you have taken the lease in your own name? He said yes. I said I want to ask you one more question, what of the employees have you talked with? Do they know anything about it? He mentioned Warden, Hopper and Martin as being the men he talked to, I said, now, George, as president of this company I will not discuss this matter with you further. I want time to think it over." In reply to the letter of Mr. McGaw of November the 7th, 1905, regarding the renewal of his contract with the plaintiff Mr. Luce wrote on the 8th of November saying, "the matter we were talking over, I believe, was the renewal of the lease, and the question of location, now, let us get that matter up first, and clean it up. As far as the other is concerned, we can get together on that without any trouble." Mr. John T. Harwood, secretary of the plaintiff company, testified that he had an interview with the defendant in Baltimore on November 30th, 1905, with a view of securing from him an assignment of the lease to the plaintiff. Mr. Harwood gave the following account of this interview: "I wanted to set before him our reasons for thinking we were entitled to an assignment of the lease, that if we got into a fight with him down here it would be a very nasty one and we desired to avoid any controversy; he said, I told Mr. Luce about it and I would buy out the Acker, Merrall and Condit business and pay them a fair price; I said, as far as that was concerned Mr. Luce had so reported to our executive committee, and they would not consider any question except the assignment of the lease, and I had been sent down for the purpose of procuring it; in reply to a rather long talk from myself in respect of what we thought Mr. McGaw ought to do in connection with the lease, he replied to me he expected the New York end of the Acker, Merrall and Condit Company to look out for itself and George K. McGaw would look out for himself; that he had always controlled the lease, and had been

there a great many years; and his relations were very close to the trustees; that Acker, Merrall and Condit Company, or anyone else could have procured the lease without the solicitation of Mr. McGaw."

On the fifth of December, 1905, the plaintiff placed the matter in the hands of Mr. John N. Steele, its attorney, who called upon the defendant, and demanded an assignment of the lease, and was referred to Mr. Thomas M. Lanahan, who informed Mr. Steele that Mr. McGaw would make the assignment which he did on the following day.   This new lease to Mr. McGaw, which he assigned to the plaintiff, was executed either on the 24th or 26th of October, 1905, for the term of three years, beginning on the 1st day of February, 1906, at an annual rental of eight thousand dollars, but the terms of this lease had been agreed upon some time before it was executed.   On the 6th of December, 1905, Mr. Luce stated that he sent for Mr. McGaw to come to Mr. Steele's office and he there told him he did not see how he could be consistently retained as manager of the company, that he asked him for his resignation; which he gave on the 8th day of December, 1905, two days after the assignment of the lease to the plaintiff.  Mr. McGaw terminated his relations as a director of the company on the 13th of January, 1906, and his resignation was accepted,

After the lease had been assigned, Mr. Steele prepared an assent to the assignment on the part of the trustees, as their assent was required by the terms of the lease, and under the terms of the instrument prepared by Mr. Steele, Mr. McGaw was released from all responsibility.   Before, however, the assignment reached Mr. Willis, Hopper and Warden had made an advance offer for the property, viz:  Nine thousand dollars per year, with Mr. McGaw as security for the rent.   Thereupon Mr. Willis, one of the trustees, said to Mr. Steele: "You have got to do one of two things; you have either got to get out of there quiet—there was some discussion as to the time, and it was said that thirty days wasn't time enough to move—I said, you will have reasonable time to get out—but

you must either let me rent this place to these people who are going to give nine thousand dollars a year, or you will have to pay me nine thousand dollars a year and you will have to give me back that lease I gave to Mr. McGaw so as to let me out entirely, all of which he did, I don't mean to say all of which he did, but he gave me the nine thousand dollars."

At the time Mr. McGaw took the lease, and at the time the offer of Hopper and Warden was made, he occupied a fiduciary relation to the company and must be held subject to the rules applicable to that relation. Mr. Pomeroy in his work on *Equity Jurisprudence*, vol. 2, sec. 1077, after stating that it is the duty of a trustee not to accept any position, or enter into any relation, or do any act inconsistent with the interests of the beneficiary, says that this rule is of wide application, and extends to every variety of circumstances. "It rests upon the principle that as long as the confidential relation lasts the trustee or other fiduciary owes an individual duty to his beneficiary, and cannot place himself in any other position which would subject him to conflicting duties, or expose him to the temptation of acting contrary to the best interests of his original *cestui que trust.* The rule applies alike to agents, partners, guardians, executors and administrators, directors and managing officers of corporations, as well as to technical trustees. The most important phase of this rule is that which forbids trustees and other fiduciaries from dealing in their own behalf with respect to matters involved in the trust, and this prohibition operates irrespectively of the good faith or bad faith of such dealing." In the case of the *Cumberland Coal & Iron Company* v. *Parrish,* 42 Md. 605, this Court said, as between trustee and *cestui que trust* or agent and principal, the rule is inflexible, that the trustee or agent cannot be allowed to take the benefit of a transaction the entering into which was a violation of his duty, or where the benefit claimed and the duty required to be performed are in any respect inconsistent, the one with the other. The rule is founded on considerations of public policy, having in view the great difficulty, which must always exist in such cases, of obtaining clear and satisfactory evidence of the fair-

ness of the transaction, and of the entire absence of all the abuse or advantage taken of the confidence reposed in such trustee or agent. It is now well settled that directors and managers of corporations, and such other companies, are equally within the rule which guards and restrains the dealings and transactions between trustee and *cestui que trust*, and agent and his principal; such directors or managers being in fact trustees and agents of the body represented by them." And in *Booth* v. *Robinson*, 55 Md. 436, the Court, speaking through JUDGE ROBINSON, said: "Directors in joint stock companies are not, in the strict and technical sense of the term, trustees for the stockholders. The property of the corporation is not vested in them, but in the body corporate. They are, however, in one sense, trustees, and they occupy a fiduciary relation to the corporation and its stockholders. They are entrusted with powers which are to be exercised for the common and general interest of the corporation, and not for their own private individual benefit. The confidence reposed in them, and the position they occupy toward the corporation and stockholders, require a strict and faithful discharge of duty, and they are not allowed to derive from their position, either directly or indirectly, any profit or advantage whatever, except it be with the full knowledge and concurrence of the company represented by others than themselves. And if this relation and duty be violated, to the injury of the corporation or its stockholders, the law affords an ample redress for the wrong against the guilty parties."

It is, therefore, clear that if the defendant secured the lease in his own name, under the circumstances mentioned, when he could have secured for the company at the same rental, his failure to do so was a breach of duty, and if loss thereby resulted to the plaintiff he is liable, or if while a director of the company he aided and abetted Hopper and Warden to obtain a lease of the premises, or if he authorized them to make the offer mentioned in the evidence whereby loss accrued to the plaintiff he is liable. That he did, while a director of the company, take the lease in his own name is not denied; that

he could have secured it for the same rental for his company might have been reasonably inferred from his relation to the trustees, from his own declaration, and from the testimony of Mr. Willis, one of the trustees. Neither is it denied that he was ready to become responsible for the rent of nine thousand dollars per year in case the offer of Warden and Hopper was accepted. And the testimony of Mr. Willis, a portion of which we have quoted, tends to show that the plaintiff was compelled to pay an additional or advanced rent for the property in consequence of that offer.

Was this offer of Hopper and Warden made for and on behalf of Mr. McGaw? He had determined to go into the grocery business; had offered to buy the plaintiff's business; he wanted the premises in which to conduct that business; had secured the lease in his own name on the premises then occupied by the company, and had been forced to assign the same to the plaintiff; he had talked to Hopper and Warden about his plan; Warden was his brother-in-law and both had been employed by the defendant in the plaintiff's store, and the three had been dismissed from its employment shortly before the offer was made. Warden expected to go with Mr. McGaw when he opened his new business, and Hopper did become a member of the firm of Hopper, McGaw & Company which was formed on the 1st of February, 1906. What conclusion would men familiar with the practical affairs of life draw from such facts? Would an experienced business man pledge his financial responsibility to start a rival business to his own? Could it not be well argued from the facts disclosed from this record, in the absence of all testimony to the contrary, that this offer was really made in behalf of the defendant, and might not a jury have so found? We think they might reasonably have so concluded. We are of the opinion that, apart from the excluded testimony, there was evidence legally sufficient to have taken the case to a jury, and for error committed in granting the defendant's prayer the judgment must be reversed.

The declaration, which was not demurred to contains only one count, but embraces two distinct causes of action. But

it may be amended before the re-trial, so that each count may embrace only one cause of action, and thus avoid the vice of duplicity which is apparent in the present *narr.*

We cannot approve of the form of the defendant's prayer, which we have transcribed in full in the early part of this opinion.    It is provided by *Article 5, sec. 9, Code 1904,* that "in no case shall the Court of Appeals decide any point, or question which does not plainly appear by the record to have been tried and determined by the Court below."    This prayer is too general and indefinite.    It raises no definite point or question for the decision of the Court.    It asserts that the plaintiff had offered no evidence legally sufficient to support "the material averments" of the declaration.    What material averments.    It points out none.    All are supposed to be material.    It points out no particular ground essential to the plaintiff's right to recover wherein there has been a failure of proof.    It is not a demurrer to the evidence, but is directed to some failure of proof upon some point which it does not disclose.    It is too indefinite to present any question for decision by this Court, and should have been refused.

The record contains four exceptions to the action of the Court in excluding certain testimony.    The first exception was abandoned.    The second and third were taken under the following circumstances.    The plaintiff offered to prove by John N. Steele that while negotiations were going on with the trustees and before the lease was executed Mr. Lanahan called him up and asked him to come to see him.    He testified that he went to see Mr. Lanahan and that he "told me that the matter of the lease could be adjusted if the Acker, Merrall and Condit Company would either renew its contract with Mr. McGaw, or pay him the balance of his salary from the time of his resignation down to the time—I think it was the first of the following April when his contract expired, that the approval of the trustees to the assignment of the lease at $8,000.00 a year would be obtained."    It further offered to prove by John T. Harwood that he called on Mr. Lanahan in reference to the offer made by Hopper and Warden, and that

Mr. Lanahan stated "that he thought the Acker, Merrall and Condit Company and Mr. McGaw ought to get together, and not engage in a bad piece of litigation down here in Baltimore,. and that if the company would renew Mr. McGaw's contract. as manager at $10,000.00 a year that expired in the following April, the offer made to the trustees by the other parties. . would be withdrawn."

Two facts are here apparent, first, that the offer of Mr. Lan-· ahan was made for the purpose of compromising or settling the· existing difference between the parties; secondly, that the statement made by him in that connection and as a part of. the offer, and as an inducement to its acceptance, that if his proposition were agreed to the offer made by the other parties would be withdrawn, would if admitted, tend directly to fix a liability upon the defendant under the issues in this case. The statement as to the withdrawal of the offer was made in order· to induce a compromise of pending troubles, and must be· governed by the general rule which render admissions made· under such circumstances inadmissible. In *Biggs & Company·* v. *Langhammer,* 103 Md. 102, we said in an opinion delivered! by JUDGE PEARCE: "The rule is well settled that "offers by a. party with a view to compromise, to pay or to accept a sum· of money, or to make deductions, and in general to secure a. settlement, are inadmissible, and though there are some cases which hold that such offer is admissible, unless stated to· be without prejudice, yet the prevailing rule is that the offer· will be presumed to have been made without prejudice." There is an exception to this rule under which admissions of· particular facts may be received. This exception is stated and applied by this Court in *Calvert* v. *Friebus,* 48 Md. 45,. wherein it is held that if an admission of an existing fact. be made as a mere concession in order to induce a compromise, it is not receivable in evidence. We, therefore, find no error· in the rulings upon the testimony.

There is one remaining question. The four exceptions reserved by the plaintiff have been embodied in one bill of exceptions. The mode of presenting the questions reserved for·

review while approved in a number of States, has never
been sanctioned here, and the presentation of more than one
question of law in one bill of exceptions was characterized by
this Court in *Tall* v. *Steam Packet Company*, 90 Md. 250, "as
an unusual and an erroneous way to present such essentially
distinct propositions," although the Court did not refuse to
consider the case because 'of this irregularity. We will not
dismiss the case upon this ground, but we must express our
entire disapproval of the method pursued, and express the
hope that it will be hereafter abandoned.

> *Judgment reversed, and new trial
> awarded, the appellee to pay the
> costs.*