WARD *et al.*, *Appellants and Respondents*, v. DAVIDSON *et al.*, *Respondents and Appellants*.

1. **Corporation:** DIRECTORS: SALARY OF PRESIDENT. Where the directors of a corporation have a right to and do fix the salary of the president and he accepts the office thereunder, he cannot by his vote as a director increase such salary.

2. ———: ———. He cannot at the same time and in the same matter act for himself and the corporation, of which he was agent and trustee, being both director and president.

3. **Practice Act:** MATTERS ARISING AFTER SUIT. The practice act recognizes the right to bring before the court matters arising after the filing of the petition.

4. **Pleading:** AMENDED PETITION. The amended or supplemental petition must set forth all the facts, so there will be but one pleading.

5. **Officers of Corporation:** GOOD FAITH REQUIRED: DEALING WITH CORPORATE FUNDS FOR PRIVATE GAIN. Directors and officers of a corporation occupy a position of trust and must act in the utmost good faith. They will not be allowed to deal with the corporate funds and property for their private gain.

6. ———: ———: ———. They cannot deal with themselves and for the corporation at the same time, and must account for profits

made by the use of the company's assets and for moneys made by a breach of trust.

·7.  ———: ———.  Where work is done for a corporation in good faith under circumstances of emergency at a fair price, the president who ordered and superintended the work cannot be charged for over-cost of the same although it might have been done for less under other circumstances.

:8.  Corporation: DIRECTORS, REMOVAL OF.  Directors of a corporation are expected to exercise their judgment and cannot be removed for abuse of their trust except on facts amounting to misconduct in office.

*Cross-Appeals from St. Louis Court of Appeals.*

REVERSED.

*G. A. Madill,* and *James & C. S. Taussig* for plaintiffs, as appellants and respondents.

(1)  Under the law and facts, the court below properly restrained the defendant corporation from trading in boat stores with outsiders and from purchasing and selling grain.  These transactions were and are beyond the power of the corporation; they are not authorized by the express terms of the charter, and they were not necessary for the legitimate business of the corporation. Even if they had been expedient, and made with pure motives, they would have been none the less illegitimate. Authorities in support of this proposition are abundant. Every abuse of its power, by a corporation, is a violation of the law of its being, and a forfeiture of its franchises. *Commonwealth v. Ins. Co.,* 5 Mass. 232; 2 Kent's Com. [13 Ed.] 312; Green's Brice's *Ultra Vires,* 78–82, ·90–92; Ang. & Ames on Corp. [10 Ed.] secs. 242, 256; *Gregory v. Patchett,* 38 Beav. 595; *Lyde v. Railroad,* 36 Beav. 10, 16; *St. Louis v. Russell,* 9 Mo. 507; *Hoagland v. Railroad,* 39 Mo. 459; *Mathews v. Skinker,* 62 Mo. 329; *Pearce v. Railroad,* 21 How. 442; *Bangor v. Whiting,* 29 Me. 123; *Railroad v. Dandridge,* 8 Gill

& J. 318; *Coleman v. Railroad*, 10 Beav. 1; *Terrett v. Taylor*, 9 Cranch, 51; *Attorney-General v. Bank*, Walk. (Mich.) 97; *Blair v. Ins. Co.*, 10 Mo. 559; *Railroad v. Marion*, 36 Mo. 303; *Ruggles v. Collier*, 43 Mo. 303; *Attorney-General v. Railroad*, 6 Jur. [N. S.] 1006; *Downing v. Railroad*, 40 N. H. 230; *Wiswall v. Railroad*, 3 Jones Eq. 183; *Bangor Corp. v. Whiting*, 29 Me. 123. A railroad company cannot operate or support a connecting line of steamboats for the purpose of increasing or benefiting its own business. *Hoagland v. Railroad*, 39 Mo. 459; see also *Colles v. Trowbridge*, 18 N. Y. 397. The grain transactions were *ultra vires* whether they created a partnership or not. Green's Brice's *Ultra Vires*, 334-8; *Champion v. Bostwick*, 18 Wend. 175; *Brownlee v. Allen*, 21 Mo. 124; *Lenglee v. Smith*, 48 Mo. 276. (2) The obedience of the corporation to the preliminary injunction affords no reason why the injunction should not have been made perpetual at the final hearing. *Duke, etc., v. Morris*, 6 Hare, 340; *Kaime v. Harty*, 4 Mo. App. 357; Kerr on Inj. [2 Am. Ed.] 440. (3) The evidence does not show acquiescence by plaintiffs in the *ultra vires* act of the corporation or any laches on their part. (4) But even if there had been acquiescence or laches of the plaintiffs, the court was still justified in restraining the corporation from violating the law and its charter in the future. The restraining orders in this case did not affect innocent parties dealing with the corporation, who might be heard in invoking the doctrine of acquiescence by stockholders. In this case the restraining orders affect solely the corporation, and enjoin it from doing in the future, that which it had done in the past, without warrant of law. Kerr on Inj. [2 Am. Ed.] 44, and cases cited; *Kaime v. Harty*, 4 Mo. App. 357, 359; *Gas Light Co. v. Broadbent*, 7 H. Lds. 600, 612; *Duke of Beauford v. Morris*, 6 Hare, 340, 350; *Cudden v. Morley*, 7 Hare, 201; *Potts v. Levy*, 2 Drews, 272; *Gay v. Railroad*, 4

Ry. Cases [Eng.] 235; *Clark v. Young*, 2 B. Mon. 57; 1 High Inj. [2 Ed.] sec. 41, p. 32; *Id.*, sec. 714, p. 462; *Railroad v. Railroad*, 81 Ill. 523; *McLaughlin v. Kelly*, 22 Cal. 211; *Lorondes v. Bettle*, 33 L. J. Ch. 451; *Printing & Dyeing Co. v. Fitch*, 61 Paige Ch. 68. (5) The corporation is the only defendant affected by the restraining orders. But the corporation does not in its motion for a new trial and rehearing, or in its assignment of errors in this court, complain of, or point out the injunction orders as a ground for a new trial, and ought not to be heard in this court to object to that part of the decree. *Griffin v. Regan*, 79 Mo. 75; *Billinger v. Carrier*, 79 Mo. 318; *Hill v. Alexander*, 77 Mo. 296, 303; *Bevin v. Powell*, 11 Mo. App. 220, 221; *Buche v. Ravins*, 10 Mo. App. 579. (6) The plaintiffs were entitled to a decree compelling the individual defendants to account for, and to return to the corporation, the money and property which they illegitimately appropriated to themselves, or which they permitted their co-defendants to appropriate; to account for all profits which they illegitimately made by the use of the money and property of the corporation; to account for losses occasioned to the Packet Company by breaches of trust, and for interest on money of the corporation used by them, or with their consent. As far as the court rendered money judgments against the defendants, they are not only fully supported by the evidence, but the plaintiffs claim here, as appellants, that the judgments should have been for a much larger sum, and against all defendants. (7) Hutchinson was properly removed. The court will deal with him as it finds him at the time of the decree. The power of removal of unfaithful officers should be exercised by the corporation. *St. Charles College v. Adams*, 44 Mo. 585; *Dodge v. Wolsey*, 18 How. 331; *Rogers v. Lafayette Ag. Works*, 52 Ind. 297; *Heath v. Railroad*, 8 Blatch. 347; *Kochler v. Black*, 2 Black, 722. (8) The court properly exercised its

authority in appointing a receiver. R. S., 1879, sec. 949; *Keokuk, etc., v. Davidson,* 13 Mo. App. 561; *Davis v. Gray,* 16 Wall. 219; *Nichols v. Perry,* 11 N. J. Eq. 126; High on Receivers, secs. 109, 110. (9) The rule of equity pleading was (and still is, where not superseded by the code), that anything which arose in a cause subsequent to the commencement of the suit, had to be stated in a supplemental bill, which did not take the place of the original bill, but supplemented it and was read in conjunction with the original bill. Story's Eq. Pl. [9 Ed.] secs. 332, p. 296; and sec. 336, p. 299; Mitford's Pl., 60; 2 Dan. Ch. Pl. & Pr., 1516, and notes; *Goodwin v. Goodwin,* 3 Atk. 370; *Thompson v. Hill,* 5 Yerger, 418. And so, under the general equity practice, amendments of a bill always related to matters which occurred prior to the filing of the first bill. 1 Dan. Ch. Pl. & Pr., p. 407, note 3. But the code of practice has done away with this distinction and treats the terms "amended and supplemental petitions" as synonymous (R. S., 1879, sec. 3573), and does away with the old practice of supplemental petitions to be read in conjunction with the original petition. R. S., sec. 3576.

*Broadhead & Haeussler* and *Cecil V. Scott* for defendants, as respondents and appellants.

(1) The judgment against Hutchinson was clearly wrong. (*a*) In removing him from the office of director, because the removal from office was based upon his dereliction of duty in his office as director, and yet he was not a director until long after the institution of the suit, and, therefore, could not have been guilty of any neglect of duty as director when the suit was brought. (*b*) In rendering judgment against him for twelve hundred and eighty-two dollars where there is no charge against him in the petition, except for failure to dis-

charge his duty as director. (2) The money judgments against the other directors were erroneous—because there is no determination of the issues made by the pleadings, nor anything to show upon what issues these judgments were rendered. The demand of the plaintiffs in this suit is not an entirety, but consists of several distinct causes of action, and unless the judgment shows upon which cause of action it was rendered, it would be no bar to another suit upon any one of the causes of action set out in the petition. *Corby, Adm'r, v. Taylor*, 35 Mo. 447. Where the cause is submitted to the court without a jury, a judgment rendered generally, without finding the issues between the parties, is erroneous. *Furgeson v. Sewell*, 1 Mo. 256. A record of a judgment is sufficient, if the time, place, parties, matter in dispute, and the result are clearly stated. *Barrett v. Garrigan*, 16 Iowa, 47. A judgment or decree should show upon its own face what the court has decided. *Horner v. Colmesuit*, 1 J. J. Marsh. 506. Where two or more issues are joined, it is error to omit finding on any of them. *Jones v. Snedecor*, 3 Mo. 390. (3) The plaintiffs in this case and the corporation must be held to have acquiesced in most of the acts charged against the defendants as causes of action in this suit. "The directors of a private corporation are agents of the stockholders and of the corporation." Field on Corporations, sec. 156. "The acts of these agents are subject to ratification like the acts of other agents." *Ibid*, sec. 162. "The books which these agents keep and make are the books of the corporation and are binding upon it and its stockholders, to this extent, that they are presumed to know everything contained in those books. Contracts of a corporation made by it, or its directors, or other agents, although *ultra vires*, are not necessarily void. If they are executed without any objection on the part of those who have become acquainted with their nature and have made no objection, they are binding so far as

the corporation and its stockholders are concerned."
*Ibid.* secs. 259, 260, 261, ·263. "A corporation may
enter into contracts that may become binding, although
such contracts exceed its authorized powers." *Ibid.*
sec. 263. "If the agents of the corporation are proceed-
ing to exercise powers *ultra vires*, before they have be-
come executed and have passed into the business of the
corporation, a court of equity would interfere and forbid
their execution." *Ibid.* sec. 264. But an interested
party cannot wait, after knowing such an act is about to
be done, and take the chances of its being beneficial to
him and then complain after it proves to be disastrous.
If he does, he assents to the act, and it becomes the act
of the corporation, as valid and as binding as any other
corporate act. It will not do for him to wait ·till the
mischief is done and then complain. *Chapman v. Rail-
road*, 6 Ohio, 119; *Peabody v. Flint*, 6 Allen, 57;
*Twin Lick Co. v. Marbury*, 91 U. S. 591; *Graham v.
Birkenhead*, 2 McN. & G. 156; *Kitchen v. Railroad*,
69 Mo. 265; *Haward v. Railroad*, 17 Wall. 81. The
evidence shows that the parties complaining of alleged
unlawful transactions of defendants knew of the same
as they progressed and they are estopped to complain
under the authorities *supra*.

BLACK, J.—The plaintiffs, who are a minority of the
stockholders of the Keokuk Northern Line Packet Com-
pany, bring this suit against five out of the nine direc-
tors, and against Peyton S. Davidson, who was the
superintendent of the company, and also make the cor-
poration a defendant for the reason, as alleged, that it
is in the control of the other defendants. The petition
in its general scope charges the defendants with having
engaged the corporation in ventures foreign to its cor-
porate powers, and alleges that they have abused their
trusts as officers, and have used the money, property
and credit of the corporation for their private gain and

emolument.    There was a general finding of the issues for the plaintiffs, and a special finding that the defendants had been guilty of misconduct as directors and officers.    The corporation and its agents were enjoined from dealing in boat stores not needed for the use of the company's boats ; from dealing in grain with Sheather or others, and from loaning its credit or money to William F. Davidson or others.    The defendants were removed from their offices, an election of other directors was ordered, and the property of the corporation put into the hands of a receiver.    Money decrees were entered in favor of the corporation and against the defendants in various amounts.    The case is here upon cross-appeals.    The proceeding, it may be added, is based upon section 948, Revised Statutes.    The questions presented are mostly issues of fact, and as the record consists of over sixteen hundred pages of printed matter we shall, in many instances, state conclusions only.

The Keokuk Northern Line Packet Company was incorporated early in 1873, by the consolidation of three rival companies.    The property of the old companies was put in at an appraised value, thus giving the new corporation a capital stock of $751,000.    The principal offices were at first divided among members of the old companies.    McCune, the president, died in 1874, when his representatives, contrary to an agreement existing between the stockholders of two of the old companies, sold their stock to W. F. Davidson.    This gave him and those acting with him a majority of the stock and the control of the affairs of the corporation.    A hostility previously existing between some of the parties was in nowise allayed by the combination of property and interests.    The minority stockholders, from 1875 to the trial of this cause, elected four directors and the majority five.    In 1875 the corporation was out of debt, and had on hand seventy-five thousand dollars in cash or its equiv-

alent. In 1878 it was in debt ninety thousand dollars and over. The property in the meantime decreased in value and quantity nearly if not quite one-half. This contrast between the McCune and the present administration is constantly pressed upon our attention, and is entitled to a fair consideration. But it must be remembered that the cash on hand was at once paid out by way of a dividend, being the first and only one ever paid; that the boats of the company, save two new ones built at a large expense, were those which came from the old companies, had been in use a long time and required expensive repairs. The average life of a steamboat, it is said, is from seven to ten years. The receipts of the company were on the constant decline, and this is nowhere more marked than in the McCune administration. This was doubtless due, in a great measure, to the competition, and especially that created by the construction of railroad lines to and from the principal points on the river. We must, therefore, be guided by the more specific evidence. The officers do not guarantee that the corporation will make money.

1. William F. Davidson was elected president in April, 1875, and continued to hold that office to the trial of this cause. The salary of the office had been, and was then fixed at four thousand dollars per annum. In October, of that year, he took a credit in his account on the books for forty-five hundred dollars, salary for the eight months and some days, being $1,555.55 in excess of the amount to which he was entitled. The matter came before the board of directors in April, 1876, when a motion to charge him with the excess was lost, four directors voting for, and four against it. But on the next day a resolution ratifying the credit as it stood was carried, four directors voting against and five for it, William F. Davidson being one of the five, and without whose vote the resolution could not have been adopted. The salary for 1876 and subsequent years remained, and indeed, was again fixed at four thousand dollars. Notwithstanding

this he had himself credited with a salary of five thousand dollars per annum for the years 1876, 1877, and 1878. The only excuse offered for this is that he refused to work for four thousand dollars. But the directors had a right to, and did fix the compensation, and he agreed to that and the amount thus fixed, by the act of accepting the office. As to the excess for 1875, he had no right to it, and he could not create a right by his own vote. He could not at the same time, and in the same matter, act for himself and the corporation of which he was agent and trustee, being both a director and president. The attempted ratification thus brought about by his own vote was of no validity. It was a void act. *Butts v. Wood*, 37 N. Y. 318; *Jones v. Morrison*, 31 Minn. 148. There is no claim of a ratification for the other years save by acquiescence, and it is shown that four of the directors at all times denied his right to these credits.

Complaint was also made because of a credit taken of one thousand dollars in one item, for traveling expenses in 1875, and in January following the stockholders passed a resolution requiring the officers and others traveling for the company to render a detailed statement of the expenses, and the directors also made an order that the secretary should not pay traveling expenses of any officer without an itemized account approved by the executive committee. Still, in December 1876, the president directed a credit to himself for one thousand dollars, for traveling expenses, without a detailed account or even the approval of the committee. Though complaints were again made, the previous order of the directors was not complied with, and this item was not even shown to be correct on the trial of the cause. It follows that William F. Davidson must be charged with the excess received on salary account, including the year 1875, and subsequent years, and the one thousand dollars alleged traveling expenses credited to him in

1876. The amended petition upon which the issues were made and tried states that the breaches of trust complained of were then still continued. In equity practice amendments to bills generally related to matters existing at the time of filing the first bill, and matters occurring thereafter were brought upon the record by supplemental bill. 2 Dan. Ch. Plead. and Pr. [5 Ed.] 1516, and notes. Our practice act recognizes the right to bring before the court matters arising after the filing of the petition. Secs. 3535, 3573, R. S. The amended or supplemental petition must set forth all the facts, so that there will be but one pleading. Section 3576. The new matter here pleaded simply enlarged the extent of the relief, by stating a continuation of the same wrong, and was proper supplemental matter. Story Eq. Plead., sec. 336; *Jaques v. Hall*, 3 Gray, 194. The accounting, in respect of salaries, will go to the date of filing the amended and supplemental petition. Beyond that we are not asked to go.

2. The Yellowstone Transportation Company was organized for the purpose of carrying out a contract with the United States for the transportation of supplies from Bismark, on the Missouri river, beyond and up the Yellowstone. The complaint is that the president and superintendent carried on this enterprise with the money and credit of the Packet Company, for their private gain, both directly and incidentally in the purchase of boats and the like. Rainey, who was a salaried agent of the Packet Company at St. Paul, Minnesota, and Davis, were at first to have a small interest, not exceeding one tenth each, but in the end they received wages only. The defendants say William F. Davidson was not interested in this Yellowstone expedition, otherwise than in looking after the interests of the Packet Company, which through him, made large advances in the way of purchasing boats, and the sale of boat supplies. But the circumstances attending the sale of supplies, the pur-

chase of boats, hereafter noticed, and his letters to Rainey while out on that enterprise, show conclusively that he and his brother, P. S. Davidson, were the real parties in interest and partners in that venture. From a full consideration of this record we can come to no other conclusion. The contract with the United States was taken in the name of Davis and P. S. Davidson, and was approved and closed on the second of April, 1877. On the fourth of that month W. F. Davidson procured, from the executive committee, authority as follows: "The president is authorized by the committee, if necessary, to pay any one purchasing the Diamond Joe Line of steamers, the Arkansas and Tidal Wave, so they may be taken permanently out of the trade of the upper Mississippi river, a sum not exceeding three thousand dollars, as a bonus, and likewise to purchase of the same line from four to six of their new barges, at a price not exceeding two thousand five hundred dollars for each barge; also the president is authorized to sell the steamer Savannah for three thousand dollars, and the steamer Victory for five thousand dollars."

The Savannah and Victory were sold to P. S. Davidson at the designated prices. Davis opened negotiations with Reynolds, known as Diamond Joe, for the purchase of the Arkansas and Tidal Wave. They were carried on under the directions of the Davidsons, and resulted in the purchase of the two steamers and four barges for twenty-eight thousand dollars. Bills of sale were made in the latter part of April for the steamers to Davis, P. S. and W. F. Davidson, placing the price of the Arkansas at ten thousand dollars, and the Tidal Wave at eight thousand dollars. The four barges were transferred to Davis and P. S. Davidson at two thousand five hundred dollars each, and were at once turned over to the Packet Company. These four steamboats were at once put into the Yellowstone fleet. Now, after the expedition had returned, and in October, 1877, W.

F. Davidson caused himself to be credited on the books of the Packet Company with three thousand dollars, the bonus for purchasing the Arkansas and Tidal Wave, and twelve thousand dollars for the four barges, being two thousand dollars more than was paid for them, or authorized to be paid by the committee. There is evidence tending to show that Diamond Joe would not sell the steamers for less than nineteen thousand dollars, but we conclude the bills of sale show the true consideration for each boat and barge. There is also evidence to the effect that these bills of sale were made to W. F. Davidson by mistake, but he was certainly known to Diamond Joe as one of the purchasers, and knew how the bills of sale were made out, and no effort was made to correct them until 1878, after this suit had been commenced, and they were not put to record until October of that year.

While the outward purpose in procuring the authority to purchase the Arkansas and Tidal Wave was to get them off the Mississippi and away from competition with the Packet Company's boats, we can but conclude the real purpose was to get them at a low price for the Yellowstone expedition, and this is the more apparent when we remember these boats were brought back in the fall. When these boats returned from the Yellowstone, in August and September, 1877, the Arkansas, Tidal Wave, Savannah and Victory were at once put to work on the Mississippi, by the president, for the Packet Company, without consultation with the executive committee, at fifty dollars per day for each, and while P. S. Davidson was yet in Montana. The Arkansas and Victory were again chartered at that price in the winter of 1878. Evidence of competent witnesses is that twenty dollars to thirty dollars per day for each boat would have been a full price, dependent upon the value and capacity of each boat, whereas no such distinction was made. This is corroborated by the price paid at the same time by the Packet Company for other boats. Again the boats were

only in the employ of the company an average of one hundred and thirty-one or one hundred and thirty-two days each, and the charter money amounted to twenty-six thousand two hundred and seventy-five dollars, when the same boats only cost in the spring twenty-six thousand dollars.    The contention is that the directors approved the chartering of these boats at fifty dollars per day, but the evidence shows that they did not meet until October, and the boats had then been in the employ of the company for the respective periods of sixty, fifty, thirty and three days.    At that meeting a list of the chartered boats was produced at the request of Gray, one of these plaintiffs.    P. S. Davidson was present and claimed the boats were worth fifty dollars a day for each. Gray and Griffith thought it was too much, and no c-tion was taken.    It is apparent that any effort to reduce the price would have been futile.    This charter money was all credited to the account of W. F. Davidson as earned.

Directors and officers of corporations occupy a position of trust and must act in the utmost good faith. They will not be allowed to deal with the corporate funds and property for their private gain.    They have no right to deal with themselves and for the corporation at the same time, and they must account for the profits made by the use of the company's assets, and for moneys made by a breach of trust.]  1 Morawetz on Priv. Corp. [2 Ed.] sec. 243, 245 ; Field on Corp., 174 ; 1 Perry on Trusts [3 Ed.] sec. 429 ; *Wardell v. Railroad*, 103 U. S. 651.    Indeed these well understood principles of law are not disputed.    It follows that these two defendants must be held accountable for the three thousand dollars bonus, the two thousand dollars overcharges on the four barges purchased of Diamond Joe, and the excessive charter money to-wit : $12,781.    The Packet Company also paid Rainey's salary while out on the trip and away from his post at St. Paul, and these defendants

will be charged with six hundred dollars on that account. The evidence that he was endeavoring to make business, while up there, for the Packet Company is too feeble to change the result just expressed. An examination of the whole record shows that the superintendent was not expected to devote his whole time to the interests of the corporation, and an allowance here, because of his salary having been paid during that time, will be denied.

P. S. Davidson had a credit of five hundred and eighty-three dollars in December, 1877, for interest on twelve thousand dollars, being the alleged price of the four barges sold to the Packet Company and purchased from Diamond Joe. On the trial, W. S. Davidson claimed this credit of twelve thousand dollars to himself, as of date May 1, 1877, to show that his account was not overdrawn. The two things are inconsistent. They will also be charged with the five hundred and eighty-three dollars. P. S. Davidson's account was largely overdrawn. The boat supplies, sold to the Yellowstone Transportation Company, were charged to him, amounting to about twenty thousand dollars. It is shown that these supplies were sold at a profit of twenty or twenty-five per cent., because sold on time, when if sold for cash, the profit would only have been ten per cent. Taking this time into consideration his account could not have been overdrawn to any great extent. As to the claims for profits in the execution of this contract with the government, it is sufficient to say we conclude none were made.

3. The St. Paul Coal Company was a corporation doing business at St. Paul. The stockholders and officers were Rainey and the defendants, Rhodes, W. F. and P. S. Davidson. The Packet Company purchased large quantities of coal at Hampton, Illinois, and towed the same to La Crosse. In doing this the Packet Company also furnished the coal company with coal, for which it was to

pay cost prices at Hampton and one dollar per ton for transportation. After the freight had been earned and without any previous contract to that effect, rebates of twenty-five per cent. were allowed, amounting to $1,178. These defendants did this for themselves and without the knowledge of the executive committee, or any other officer of the Packet Company. When the accounts were made up in the books of the Packet Company, they were so made as not to disclose the fact that rebate had been made. Besides this the coal company was really conducted on the money of the Packet Company. It did not pay for the coal when received, but long thereafter, and interest must be charged on the moneys of the company thus used, and the trial court properly held these three defendants liable for the aggregate sum of $1,952.

4.    There is no evidence tending to prove the charge that W. F. Davidson was interested in the dock and boat yards at La Crosse, Wisconsin. They were the sole property of Peyton S. Davidson. Those yards were large and the facilities for repairing boats were of the best on the river, and the company's boats were for the most part repaired at that place. For the years 1876, 1877, and 1878, the repair bills amounted to $103,540. Omitting for the present the repairs on the Charlie Cheever, we are satisfied they were necessary, and that the bills were reasonable. The work seems to have been done as low as it could have been done at St. Louis, or elsewhere. While all the bills are not made out with that detail, shown to be the custom at some yards, still they fairly disclose the work done, and its cost. The fairness of these bills is not impeached, but rather established. In the summer of 1877, the water got low in the upper river ; so low that the company's side-wheel boats could not get through. The president found five of them detained at Beef Slough below the Chippewa river, at one time. He ordered the Cheever into the yards at La Crosse and had

her lengthened ninety feet, hull and cabin, and by so doing, her draft was decreased one-half or more and she could and did take a full trip, passenger and freight, from the side-wheel boats to the destination. The emergencies of the case required prompt action. The president superintended and hastened on the work. While it is shown that he stated the work could have been done on the Ohio river for less money, by three thousand dollars, still we cannot disregard the circumstances under which the work was done. There does not appear to have been any want of good faith, and the price of the work under the circumstances does not appear to be unreasonable. No judgment should be had in this case because of any of these repair bills.

5. In September, 1877, the president employed Sheather as freight agent at two hundred dollars per month. Sheather made arrangements with Cole Brothers to furnish money to buy wheat and the president agreed to guarantee him against loss to the extent of the freight charges. This was done without authority from the directors. The matter was laid before them in October, and while they passed a resolution refusing to purchase merchandise, they did authorize arrangements to be made with persons to induce them to buy freight for the boats. Gray was in favor of this resolution. A written contract was made by the president with Sheather substantially the same as the verbal one, and in which the commission merchants agreed to prorate to the extent of their selling commissions. Sheather was charged freight on the books at the regular rate, amounting to $9,156. That the venture was unsuccessful is not disputed, and Sheather became entitled to a rebate of six thousand dollars. This he received, and we do not see why he was not entitled to it. As to the other credit of three thousand dollars we conclude he was also entitled to that, for it appears to have been given him on account of rebate, which the company owed others and which he

took up and turned in, and on account of rebates due to him for shipments after the contract was closed. It is true the company made some advances; but they were for the most part made by the commission merchants, and such as were made have been paid. Nor is there any reason why he should be deprived of his salary. The claim that he received a salary from March to September, when he was not in the employ of the company, does not appear to be supported by the evidence, except the evidence of the expert book-keeper, and he must be mistaken, or his evidence incorrectly reported. These transactions are entitled to consideration upon the other issues, but do not justify a money judgment.

6. The pleadings admit that the Northern & Southern Express Company was incorporated in 1875, and since then has made a contract of some kind with the Packet Company for the carriage of its express matter. Since 1875 its business, on board of the boats, has been transacted by the clerks without compensation, other than that paid by the Packet Company. The claim is that it is really conducted for the private gain of Davidson and some other of the defendants, but the proof fails to sustain the charge. The receipts of this company are from four to five thousand dollars a year as far as any showing is made, and it has paid the company according to contract about one thousand dollars per year. It has some property, such as safes, horses and wagons. The defendants are not shown to have ever received a cent from it. It has an office and a superintendent in St. Louis. The plaintiffs have known of its existence for a long time, and made no effort, in a proper way, to get the books in court, or to get the evidence of the secretary. Davidson is also shown to be a creditor in the amount of two thousand dollars. There is a failure of proof as to this branch of the case.

7. Many more matters are urged as grounds for

Ward v. Davidson.

money decrees. We have examined all of them and the evidence with respect thereto, and are of the opinion that the decrees for money, before indicated, are all that should be awarded. The powers of the corporation are, "to build or purchase, employ and use steamboats and barges, either or both, for the purpose of transporting freight and passengers." That it has been led into many transactions not within its charter powers cannot be denied. Enough also has been said to show that these defendants, except Hutchinson, have been guilty of misconduct in office and were properly removed. Hutchinson was elected director first in January, 1879. While he has voted with the majority of the directors since that time we cannot say that he has abused his trust. We are not prepared to say that the minority have always been in the right. Directors are expected to exercise their judgment. No act of his is shown which amounts to misconduct in office. The fact that he was agent at Keokuk has little to do with this case.

The final decree, so far as the restraining orders are concerned, is correct. The judgment is reversed and the cause remanded to the end that a final decree be entered in the circuit court in conformity with this opinion without any further trial of the cause. Interest at the rate of six per cent. per annum will be added to the amounts for which money decrees are taken, where none has been before indicated, from the time at which the credits were improperly taken. All concur.