POUZZNER et al. v. WESTERLY THEATRE OPERATING CO., Inc., et al.

Civil Action No. 576.

District Court, D. Rhode Island.

Sept. 9, 1946.

Edward Winsor, and Gerald W. Harrington, of Edwards & Angell, all of Providence, R. I., for plaintiffs.

S. Everett Wilkins, Jr., of Providence, R. I., for defendants.

HARTIGAN, District Judge.

This is a civil action in the nature of a derivative stockholder's suit. The primary relief sought is to compel performance of an obligation of John B. Findlay, president and a director of Westerly Theatre Operating Company, Inc. (referred to hereafter as the Operating Company) to execute a sublease to the corporation of the United Theatre which has been operated by the corporation for over 17 years, and which he has leased in his own name. Incidental relief by way of accounting for secret profits in connection with this theatre and another theatre property is also demanded.

The plaintiffs are all citizens of Massachusetts. The Westerly Theatre Operating Company, Inc. and The United Theatre Company are corporations incorporated under the laws of Rhode Island and John B. Findlay is a citizen of Connecticut.

The matter in controversy exceeds, exclusive of interest and costs, the sum or value of $3,000.

The plaintiffs are respectively the owners of the following number of shares of common stock in the Westerly Theatre Operating Company, Inc.:

| | |
|---|---|
| Morris Pouzzner | 249 shares |
| Dora G. Pouzzner | 50 " |
| Dora G. Pouzzner, Trustee for Warren Pouzzner | 100 " |
| Oakley A. Kunz | 1 " |

Said stockholdings comprise 50% of the outstanding common stock of said corporation. There is no other class of stock in said corporation.

Morris Pouzzner is treasurer and Oakley A. Kunz is assistant treasurer and secretary and they comprise half of the membership of the board of directors.

John B. Findlay is president, director and resident manager of the Operating Company and the owner of 249 shares of the common stock. Henry Harris, the fourth director, owns 1 share; Vera B. Findlay owns 50 shares; Vera B. Findlay, Trustee for John B. Findlay, Jr., owns 50 shares and Vera B. Findlay, trustee for David Findlay, owns 50 shares, which holdings combined comprise 50% of the outstanding common stock of said corporation.

The business of the Operating Company is the operation of theatres in and about Westerly, Rhode Island, and at the time of the filing of this action said company operated the United Theatre in Westerly and the Central Theatre in Stonington, Connecticut. Said company has also operated the Ninigret Theatre at Watch Hill in said Town of Westerly during the summer season from year to year and formerly operated the Lyric Theatre in Stonington. The business of said company as a whole has been conducted on a profitable basis for a period in excess of 17 years. There has been no change in the membership of the board of directors or in the offices held by the parties in said company for the past 9 years and Findlay has been president, resident manager and a director of said company since its formation.

April 23, 1927, the administrators of the Estate of Henry D. Barrows leased to Findlay the so-called Lyric Theatre for a term of 2 years commencing May 1, 1927, for the annual rent of $2100 payable in equal monthly payments of $175. The lease contained an option of renewal for 3 years at the annual rent of $2300 payable in equal monthly payments of $192.50 in advance.

June 22, 1928, the Operating Company was incorporated.

June 30, 1928, Findlay leased to the Operating Company the Lyric Theatre for a term of 3 years and 11 months from June 1, 1928. The rental was at the rate of $175. for the first 11 months of the term from June 1, 1928, to May 1, 1929, and at the monthly rental of $192.50 for 3 years thereafter. This theatre was closed about 1932 and Findlay continued to lease it from the Barrows Estate and to sublease it to the Operating Company for the purpose of protecting the Operating Company from competition in that area.

The parties have stipulated that the amounts paid by Findlay to the Barrows Estate for rent of the Lyric Theatre for

the period from 1927 to 1944 were as follows, May, 1927, through April, 1932, $175 a month; May, 1932, through August, 1932, $150 a month; September, 1932, through November, 1932, no rent was charged; December, 1932, $150; January, 1933, through April, 1941, $135 a month; May, 1941, through August, 1944, $125 a month.

The Operating Company actually paid Findlay for the rent of the Lyric Theatre at the rate of $175 per month from 1931 to March 31, 1932, and from April 1, 1932, to August 31, 1944, at the rate of $192.50 per month.

June 30, 1928, the Operating Company and Morris Pouzzner executed a contract wherein Pouzzner was employed as General Manager of the United, Central and Lyric Theatres.

June 30, 1928, the Operating Company and Findlay entered into a contract whereby Findlay was employed as resident manager of said three theatres for a term of 17 years and 7 months beginning June 1, 1928, which term is also the term of said indentures of lease of said United and Central Theatres to the Operating Company. Pouzzner's term as General Manager was for the same period.

Findlay's contract contained the following provision:

"Said Manager is to have charge and control, under the direction of the General Manager of said three theatres, and he agrees to serve said company with his utmost skill, diligence, ability and loyalty in the discharge of his duties."

June 30, 1928, Findlay leased to the Operating Company the United and Lyric Theatres which he had theretofore conducted and operated.

June 30, 1928, the Westerly Central Theatre Realty Company leased to the Operating Company the Central Theatre for a term of 17 years and 7 months commencing June 1, 1928. The lease of the United Theatre to the Operating Company was for the same term and the lessor of said United Theatre consented to the subletting to the Operating Company.

March 5, 1945, Samuel Nardone & Company, Inc., leased the United Theatre to Findlay. The rent for the first 5 years commencing January 1, 1946, was at the rate of $15,600 per annum together with an option to the lessee for an additional term of 5 years at $16,200 per annum.

December 14, 1945, Findlay leased the United Theatre for a term of 5 years commencing January 1, 1946, to the United Theatres Company, a corporation duly established under the laws of the State of Rhode Island in December, 1945. This lease provided that the lessor would be paid, "as rent the sum specified, upon, at the time, and at the places set in a separate written agreement of even date herewith signed by the parties hereto and by this reference incorporated in and made a part hereof, * * * together with an option on the part of the Lessor to extend the term of this lease for an additional term of five (5) years commencing January 1, 1951, under the same terms and conditions as are herein written. * * *"

A supplemental agreement discloses that the United Theatres Company agreed to pay Findlay on the lease dated December 14, 1945, $22,400 per annum payable in equal monthly installments of $1866.66 each month and that an option is granted to Findlay to extend the term of the lease provided for in said indenture for an additional period of 5 years commencing January 1, 1951, at the rental of $23,000 per annum.

December 14, 1945, the United Theatres Company and Findlay entered into a contract wherein "Said company hereby appoints and employs said Manager (Findlay) as manager of said United Theatre for a term of five (5) years commencing January 1, 1946, at a salary of fifty-two hundred ($5200.00) dollars per annum payable in equal weekly installments."

At a stockholders' meeting of the Operating Company, held January 25, 1940, the following statement was made by Findlay as president of the corporation:

"The lease on the United Theatre expires on January 31, 1940, but there is a clause of option for 5 years which requires that notice of exercise of option be given 12 months in advance. This was done on December 29, 1939, and a copy

of such notice is submitted herewith to become part of these minutes."

The report of the president was accepted and approved by the meeting.

The minutes of the stockholders' meeting held on January 15, 1943, read in part as follows:

"At this time the Treasurer, Mr. Morris Pouzzner, raised the question of what we should do in connection with the leases that terminate in 1945. While it may be perhaps looking a little far ahead, he thought it was advisable to start negotiations so as to have the matter completely ironed out before the leases did terminate. After some discussion Mr. Findlay agreed to contact Mr. Nardone and ascertain from him the type of a lease he would require and also to hold, if possible, the rents to their present level. During this discussion Mr. Findlay raised a question of the lease with the Westerly Central Theatre Realty Company which expires at the same time and Mr. Pouzzner, speaking for the Westerly Central Theatre Realty Company, said that he would be agreeable to giving a lease at the same time that a lease was secured and consummated on the United Theatre."

The minutes of this meeting were approved at a stockholders' meeting held January 18, 1944.

The minutes of the meeting of January 18, 1944, disclose the following with respect to the status of leases:

"At this time Mr. Findlay reported he had contacted Mr. Nardone regarding a new lease on the United Theatre and believed he was willing to execute a new lease but at an increase of 10% over the present rate for the first 5 years and an increase of 20% over the present rate for the second 5 years. After discussion Mr. Findlay was requested to continue discussions with Mr. Nardone with the thought of securing a more reasonable rent."

The minutes of this meeting were approved at the stockholders' meeting held on February 8, 1945.

The minutes of the meeting of February 8, 1945, contains the following with respect to new leases:

"At this time Mr. Findlay reported he had negotiated a new lease with Mr. Nardone which was in his name, this being the same condition that existed with the original lease and that it was at a higher figure than the old lease. On motion duly made and seconded it was voted that Messrs. Findlay and Pouzzner be appointed a committee to negotiate for new leases on the United and Central Theatres for the benefit of the company. As both of these leases expire on December 31, 1945, this committee is to report to the directors on call of the President but not later than July 1, 1945."

The minutes of the stockholders' meetings of 1940, 1943, 1944 and 1945 lead me to no other conclusion than that Findlay and the other stockholders considered the lease of the United Theatre the property of the Operating Company.

Findlay was asked: "Was it your opinion that a new lease of the United Theatre at a rental reasonably within range of the old rental would be a valuable thing for the Operating Company to have?" He answered: "Yes, it would be valuable for me to have, for the Operating Company to have, or for anyone to have." He was also asked: "And you reported to the stockholders of the Operating Company at the meeting in January, 1940, that you would exercise the option to keep the lease alive for another 5 years?" He answered: "That was my duty to do so. I had an obligation to the Westerly Theatre Operating Company on the leases at that time." He was also asked: "And it was your duty, was it not, to keep the Operating Company advised generally of your negotiations with Mr. Nardone?" He answered: "Yes, the Operating Company was interested in how I was making out in getting a new lease with Mr. Nardone."

Findlay admitted that at the meeting of the stockholders on February 8, 1945, he reported to the stockholders that he had negotiated a new lease of the United Theatre and that it was in his name. He also admitted that at that meeting he and Pouzzner were appointed a committee to negotiate for a new lease and that the

committee was to meet at the call of Findlay, who was president, not later than July 1, 1945, and that he did not call a meeting before that date.

August 20, 1945, the Westerly Theatre Operating Company, by Pouzzner, wrote Findlay the following letter which he admitted receiving:

"I think that it is now time that the Westerly Theatre Operating Co. acquire its new leases for both the Central and the United Theatres in view of the fact that you personally hold a lease to the United Theatre in behalf of the Westerly Theatre Operating Company. I think that these leases should be drawn by Mr. Harris specifying new conditions. You have advised that you procured a ten year lease with some advances, and these conditions should be embraced in new leases or the conditions can be appended to the old leases with an extension granted for the same period."

September 6, 1945, the Westerly Theatre Operating Company, by Pouzzner, wrote the following letter to Findlay:

"I had a talk on the telephone yesterday with Henry Harris about drawing up the new leases for the Westerly Theatres, and I was astounded to hear him say that you are taking the position that the Westerly Theatre Operating Company is not entitled as a *matter of right* to a new lease for the United Theatre.

"I am writing this letter to you to find out if Harris has quoted you correctly, for I cannot conceive your taking such a position, as you know, in negotiating the new lease from Nardone, you were acting not for yourself alone, but also for the Westerly Theatre Operating Company. This fact, you will remember, is clearly borne out by the records of the various company meetings when the matter of renewal came up for discussion from time to time.

"Please let me hear from you at once that you have instructed Harris to prepare the new lease. It is better for all concerned that a new lease should be executed. Otherwise, the Operating Company will have to continue its occupation without a lease for as long a time as your

renewal from Nardone runs, paying you, however, only the present rental."

Findlay was asked: "Will you not agree with me that, as far as what you said to anybody else present was concerned, you left it that you would give the new lease if the other matters were straightened out to your satisfaction?" (Other controversial matters discussed at the 1945 stockholders' meeting). He answered: "Yes, if the matters mentioned in my report of the leases were, I certainly would have agreed to go on with the Westerly Operating Company."

Findlay testified that during the period up to December 31, 1935, the difference between the amount of rent which the Operating Company paid him and the amount he paid Nardone was $1500 yearly for the United Theatre. On the premises of the United Theatre were two stores for which Findley collected rent and said rent accounted for said difference.

During the period from January, 1936, to December, 1940, the difference between the rents on the United Theatre and two stores was $1650 and during the final period from January 1, 1945, to January 1, 1946, the difference amounted to $1800 per year.

The increase in rent on the United Theatre during each five year period amounted to approximately 10 per cent of the original rent.

Harris, a director of the Operating Company, who has been Findlay's personal attorney for many years and who is also the attorney for the Operating Company, admits that at the 1945 stockholders' meeting there was some discussion about new leases of the United and the Central Theatres.

Harris was asked: "Was it your understanding that he (Findlay) was contacting Mr. Nardone in his individual capacity or as a representative of the Operating Company?" He answered: "In the individual capacity." It is difficult for me to understand how Harris could arrive at such a conclusion in view of the background here.

Findlay claims that at the 1945 stockholders' meeting, he read the following:

"I have renewed my original personal lease for the United Theatre for a period of ten (10) years from the expiration of my present personal lease at an additional rental of approximately 10% above my personal lease." (Ex. 16)

Harris testified as follows in regard to Ex. 16:

"Q. Do you remember what portion of the stockholders' meeting, at what time in the stockholders' meeting Mr. Findlay, as you say, read what appears on that piece of paper? A. No, I do not.

"Q. Was it before or after his President's report? A. I am not certain about that.

"Q. Did you assist Mr. Findlay in drafting that piece of paper? A. I did not.

"Q. Did you see it before the stockholders' meeting? A. I am not certain whether I did or not. I may have.

"Q. Did you approve it? A. I don't recollect that I approved or disapproved it. If I did see it, it was probably within the hour prior to the opening of this meeting and not before that.

"Q. Was that particular piece of paper taken from your files or Mr. Findlay's files? A. It wasn't taken from my files.

"Q. Did you receive any copy of that paper at that meeting? A. I did not.

"Q. You have been a director of the Operating Company since the beginning? A. I believe so.

* * * * *

"Q. What did you conceive to be your duty as matters came up at directors' meetings of the Westerly Theatre Operating Company as to accepting the dictates of Mr. Findlay or as to exercising your independent judgment? A. I felt that at all times I was Mr. Findlay's director on the board.

* * * * *

"Q. When you received Mr. Pouzzner's letter of August 20, Exhibit 28, did it occur to you that there was a possible conflict of interest between the Operating Company and Mr. Findlay? A. I would say that it occurred to me there was a conflict between Mr. Pouzzner and Mr. Findlay.

"Q. And if Mr. Pouzzner was right in his contentions in that letter, there was a conflict of interest, was there not, between the Company and Mr. Findlay? A. Well, I suppose, if you want to say it that way, yes.

"Q. And you had represented Mr. Findlay previously? A. Yes.

"Q. And you were on a retainer by the Operating Company? A. Yes.

* * * * *

"Q. Mr. Harris, what did you do after you received that letter? A. I replied to this letter ultimately.

"Q. And in replying to that letter in whose behalf did you reply? A. Well, I replied, in response to this letter, in my own behalf. The meeting—The February, 1945, meeting had given certain instructions to Mr. Pouzzner and Mr. Findlay, and I inquired to find out what progress had been made in respect to these matters. I was informed by Mr. Findlay that there had been no progress and I called that fact to the attention of Mr. Pouzzner.

"Q. And in writing to Mr. Pouzzner were you writing as counsel for the Operating Company or as counsel for Mr. Findlay? A. Well, I don't know whether I can answer that or not. I didn't give him any special thought at the time. I acted according to the dictates of my understanding.

"Q. Did you, in any communication to Mr. Pouzzner, after receipt of that letter point out to him that you were in an embarrassing position or in a position of conflict and suggest to him that he should get independent counsel on behalf of the Operating Company? A. I did not.

"Q. Did you draw the lease from the Samuel Nardone & Company, Inc. to John B. Findlay on March 5, 1945? A. I did.

"Q. And for whom did you act in drawing that lease? A. John B. Findlay.

"Q. At the time you drew it you were under retainer to the Operating Company? A. I was.

* * * * *

"Q. And what—Do you recall generally what was said at those two meetings? A. Generally, as it is set forth in the minutes of the meetings. ·

"Q. That is all you recall? A. That is right."

There is no credible evidence that warrants me to believe that said Ex. 16 was read at the 1945 stockholders' meeting by Findlay.

Findlay and Harris impressed me that they were both working in the interest of Findlay and not for the best interests of the Operating Company. This was a successful corporation that paid during the war years Pouzzner about $40,000 and Findlay about $35,000 annually.

I find that Findlay did not serve the Operating Company "with his utmost skill, diligence, ability and loyalty in the discharge of his duties" as was required of him by the terms of the contract dated June 30, 1928.

I find that Findlay did not disclose to the Operating Company that he received a lower rental on the Lyric Theatre from the Barrows Estate.

I find that Findlay paid no rent for a period of 3 months on the Lyric Theatre and that he did not disclose this fact to the Operating Company.

I find that during said 3 months Findlay received from the Operating Company rent at the rate of $192.50 a month.

I find that Findlay received rent for space in the lobby of the Lyric Theatre, which, he testified, "covered a period of about 6 or 7 years," at the rate of $100 per year and that he did not turn over said rent to the Operating Company. He admits that this amount was "as near as I can figure about $500" and that he is willing to account to the Operating Company for said amount.

I find that Findlay, on or about September 12, 1944, received from the Operating Company a check for $385 which he deposited to his account for rent for the Lyric Theatre for July and August, 1944, when in fact he paid only $250 for rent to the Barrows Estate and that he did not disclose this to Pouzzner or anybody else

connected with the Operating Company although he admitted that "it was suggested a few times at meetings" that he try to procure a lower rent.

I find that Findlay, as early as January, 1945, was negotiating with third parties to go in with him on the United Theatre and that he did this without the knowledge of the Operating Company.

I find that prior to the formation of the United Theatres Company in December, 1945, that Findlay made disclosures to other parties in interest in that company, namely, Donald Jacocks and Alexander Kilpatrick, that he was, at the time, president, director and resident manager of the Operating Company and that the United Theatres Company took the lease to it from Findlay with full knowledge of the claims of the Operating Company to the new lease from Samuel Nardone & Company, Inc., to Findlay.

Findlay testified: "I told Mr. Jacocks and Mr. Kilpatrick in October that as of December 31st—after December 31, 1945 that I would own the lease on the United Theatre. I further advised them that I had been—I had sublet the theatre for 18 years up until that time. I told them that possibly Mr. Pouzzner might contest the lease which has proven to be a true guess, but I led them definitely to believe, as I believed, that after December 31, 1945, I could do with my lease as I saw fit."

I find that the minutes of the 1943 and 1944 annual stockholders' meetings, as approved, show clearly that Findlay was acting in a fiduciary capacity on behalf of the Operating Company in acquiring the new lease for the United Theatre from Samuel Nardone & Company, Inc.

I find that Findlay is trustee with respect to the lease of the United Theatre from Samuel Nardone & Company, Inc., to him dated March 5, 1945, for the Operating Company.

13 Am.Jur. § 997 is as follows:

"Generally; Fiduciary Relationship.— In a broad sense the directors and officers of a corporation are its agents. While they may not be in the strict sense trustees, it is well established that they occupy a fiduciary, or more exactly a quasi-fiduci-

ary, relation to the corporation and its stockholders. The entire management of corporate affairs is committed to their charge upon the trust and confidence that they will be cared for and managed within the limits of the powers conferred by law upon the corporation and for the common benefit of the stockholders. They are required to act in the utmost good faith, and in accepting the office they impliedly undertake to give to the enterprise the benefit of their care and best judgment and to exercise the powers conferred solely in the interest of the corporation or the stockholders as a body or corporate entity, and not for their own personal interests. Clothed with the power of controlling the property and managing the affairs of the corporation, without let or hindrance, as to third persons the directors and officers are its agents, but as to the corporation itself, equity holds them liable as trustees. Indeed, it is the view frequently and broadly taken that the officers and directors of a corporation are, at least in substance and in many respects, trustees for the corporation or its stockholders."

The case of McCourt v. Singers-Bigger, 8 Cir., 145 F. 103, 7 Ann.Cas. 287, was a suit in equity brought by Marie Antoinette Singers-Bigger for and on behalf of the Colorado Amusement Company, a Colorado Corporation of which she was a stockholder, and which had refused to bring the suit, against the defendant, the Consolidated Amusement Company, a corporation of Colorado, its officers and others to impress certain leasehold estates held by the latter corporation, with a trust in favor of the former, for an accounting concerning the profits made by the latter in the operation of the leasehold estates, and for other relief. The leasehold estates involved two theatres and the facts are somewhat similar to those in the instant case.

At page 107 of 145 F. the court said:

"Before disposing of the main question, a preliminary consideration of the obligations and duties imposed by law upon directors of a corporation may not be unprofitable. Whatever may be the technical relation between them and the corporation itself, its creditors, or the public, they are, in a general and universal sense, trustees for the stockholders. They are chosen to represent them in the enterprise upon which they mutually embark. Their duty is to use and employ the corporate assets and all corporate facilities and privileges, within the limits of powers conferred upon the corporation by law, for the ultimate benefit and advantage of the shareholders. They have no rights in such assets or facilities or privileges superior to those of their principals. They occupy toward them strictly fiduciary relations and are accountable to them on principles governing that relationship. Any action by them impairing corporate rights of sacrificing corporate interests is regarded as a flagrant breach of trust on their part. Thompson's Commentary on the Law of Corporations, vol. 3, § 4009 et seq., and cases cited.

"In Ward v. Davidson, 89 Mo. 445, 458, 1 S.W. 846, Black, Judge, speaking for the court, says:

" 'Directors and officers of corporations occupy a position of trust and must act in the utmost good faith. They will not be allowed to deal with the corporate funds and property for their private gain. They have no right to deal with themselves and for the corporation at the same time, and they must account for the profits made by the use of the company's assets, and for moneys made by a breach of trust' citing 1 Morawetz on Priv. Corp. (2d Ed.) §§ 243, 245; Field on Corp. 174; 1 Perry on Trusts (3d Ed.) § 429."

At page 108 of 145 F. the court said:

"The general rule, as declared in the American and English Encyclopedia of Law (volume 18, p. 696), is as follows:

" 'Though a tenant may not have any absolute right to a renewal against the will of his lessor, courts of equity recognize his reasonable expectancy of renewal as a property or asset, and if one standing in a fiduciary or quasi fiduciary relation to a lessee secures a renewal of the lease to himself, a court of equity will treat him as holding the lease in trust for the original lessee.'

"The principle so declared is supported by abundant authority.

"In Davis v. Hamlin, 108 Ill. 39, 48 Am. Rep. 541, the Supreme Court of Illinois considered a similar question. In that case the managing agent of the owner of a theatre, who by reason of his employment had learned the methods of conducting the business and had become familiar with its value and future possibilities, at the expiration of a lease in the name of his principal, privately secured a renewal thereof to himself. The court held him to be trustee with respect to that lease for his principal. Amongst other things, it said:

"'The obtaining of the lease by Davis amounted to a virtual destruction of his employer's whole business at the termination of the old lease, under which the latter was holding. * * * There was a good will attached to it, which was valuable. * * * If a manager of a business were allowed to obtain such a lease for himself, there would be laid before him the inducement to produce in the mind of his principal an underestimate of the value of the lease, and to that end, may be, to mismanage so as to reduce profits, in order that he might more easily acquire the lease for himself. * * * Although there was here no right of renewal of the lease in the tenant, he had a reasonable expectation of its renewal, which courts of equity have recognized as an interest of value. * * *'

"This principle was early declared by Chancellor Walworth in Phyfe v. Wardell & Woolley, 5 Paige, N. Y., 268, 28 Am. Dec. 430. He there lays down the doctrine in these words:

"'If a person who has a particular or special interest in a lease obtains a renewal thereof from the circumstance of his being in possession as tenant, or from having such particular interest, the renewed lease is, in equity, considered as a mere continuance of the original lease, subject to the additional charges upon the renewal, for the purpose of protecting the equitable rights of all parties who had any interest either legal or equitable in the old lease.'

"To the same effect are Gibbes v. Jenkins, 3 Sandf.Ch., N.Y., 130, 134; Mitchell v. Reed, 61 N.Y. 123, 129, 19 Am.Rep. 252; Johnson's Appeal, 115 Pa. 129, 133, 8 A. 36, 2 Am.St.Rep. 539; Hannerty v. Standard Theater Company, 109 Mo. 297, 19 S.W. 82; Cushing v. Danforth, 76 Me. 114; Bennett v. Vansyckel, [11 N.Y.Super Ct. 462, 472] 4 Duer 462, 472.

"In the case of Robinson v. Jewett, 116 N.Y. 40, 51, 22 N.E. 224, the Court of Appeals of that state well expresses the doctrine and reasons for it. It there says:

"'Those who are in possession of lands under a lease have an interest therein beyond the subsisting term, usually called the tenant's right of renewal. Between the landlord and tenant this interest cannot strictly be denominated a right or estate, but is merely a hope or expectation; there being, in the absence of contract, no way, legal or equitable, of compelling a renewal. But, as between third persons, the law recognizes this interest as a valuable property right, and the renewal as a reasonable expectancy of the tenants in possession. * * * It (the rule) is appropriately applied to a trustee of a corporation taking in his own name a renewal lease of the premises in possession of the corporation. Every consideration, legal or moral, requires that the trustee should protect the corporation and its property and see that the interest of other stockholders suffer no loss from his default. * * * Between the trustee and the corporation the right of renewal of the lease is a property right, and, if the lease is renewed in the name of the officer, it enures to the benefit of the corporation.'"

In Acker, Merrall & Condit Co. v. McGaw, 106 Md. 536, 68 A. 17, 21, 22, the court said:

"* * * Mr. Pomeroy, in his work on Equity Jurisprudence (volume 2, § 1077), after stating that it is the duty of a trustee not to accept any position, or enter into any relation, or do any act inconsistent with the interests of the beneficiary, says that this rule is of wide application, and extends to every variety of circumstances. 'It rests upon the principle that as long as the confidential relation lasts the trustee or other fiduciary owes an undivided duty to his beneficiary, and cannot place himself in any other position which would subject him to conflicting duties, or ex-

pose him to the temptation of acting contrary to the best interests of his original cestui que trust. The rule applies alike to agents, partners, guardians, executors and administrators, directors and managing officers of corporations, as well as to technical trustees. The most important phase of this rule is that which forbids trustees and other fiduciaries from dealing in their own behalf with respect to matter involved in the trust, and this prohibition operates irrespectively of the good faith or bad faith of such dealing.' In the case of Cumberland Coal & Iron Co. v. Parish, 42 Md. [598], 605, this court said, as between trustee and cestui que trust or agent and principal, the rule is inflexible that the trustee or agent cannot be allowed to take the benefit of a transaction the entering into which was a violation of his duty, or where the benefit claimed and the duty required to be performed are in any respect inconsistent, the one with the other. The rule is founded on considerations of public policy, having in view the great difficulty, which must always exist in such cases, of obtaining clear and satisfactory evidence of the fairness of the transaction, and of the entire absence of all the abuse or advantage taken of the confidence reposed in such trustee or agent. It is now well settled that directors and managers of corporations, and such other companies, are equally within the rule which guards and restrains the dealings and transactions between trustee and cestui que trust, and agent and his principal; such directors or managers being in fact trustees and agents of the body represented by them. And in Booth v. Robinson, 55 Md. [419], 436, the court, speaking through Judge Robinson, said: 'Directors in joint stock companies are not, in the strict and technical sense of the term, trustees for the stockholders. The property of the corporation is not vested in them, but in the body corporate. They are, however, in one sense, trustees, and they occupy a fiduciary relation to the corporation and its stockholders. They are intrusted with powers which are to be exercised for the common and general interest of the corporation, and not for their own private individual benefit. The confidence reposed in them, and the position they occupy toward the corporation and stockholders, require a strict and faithful discharge of duty, and they are not allowed to derive from their position, either directly or indirectly, any profit or advantage whatever, except it be with the full knowledge and concurrence of the company represented by others than themselves. And if this relation and duty be violated, to the injury of the corporation or its stockholders, the law affords an ample redress for the wrong against the guilty parties.' "

In Bliss Petroleum Co. v. McNally, 254 Mich. 569, 573, 237 N.W. 53, 55, the court said:

"Directors owe the corporation good faith and honest service. Good faith includes, not only personal upright mental attitude and clear conscience, but also intention to observe legal duties. Honest service includes elimination of private gain in corporate transactions conducted by directors and not approved by other authorized disinterested officers, with full knowledge of the facts. If directors undertake to acquire property for the corporation, they act in a trust capacity in acquiring it. Express direction by the corporation to them to purchase is not a requisite of liability in this respect. Nor does the fact that they have a right to deal personally in leases modify their duties as directors when their transactions touch the corporation itself. Their obligations and liabilities arise out of their trust duties in dealing fairly with the corporation. If they purchase personally, with the intention to sell to the corporation, or while purporting to act as corporation officers, the whole benefit of the purchase inures to the corporation, and the rule of secret profits applies. In such case, the rule of damages is that directors would be liable for the price paid by the corporation less the cost of the lease to them. (Cases cited)."

 The plaintiffs are entitled to a judgment ordering the cancellation and discharge of the lease dated December 14, 1945, from Findlay to the United Theatres Company of the United Theatre, ordering Findlay to pay to the Operating Company the sum of $500 of Lyric Theatre rent ad-

884

mittedly due from Findlay with interest from the date of its wrongful appropriation, together with Findlay's full secret profits on both the Lyric and United Theatres subleases with interest from the date that all such profits were obtained and an injunction enjoining Findlay and The United Theatres Company from operating or endeavoring to operate the United Theatre independently of the Westerly Theatre Operating Company, Inc. or from interfering with the possession and operating of said theatre by Westerly Theatre Operating Company, and also costs to be assessed against Findlay and The United Theatres Company.

Judgment may be entered in accordance with this opinion on two days' notice and if the parties are unable to agree upon the amount due the plaintiffs, the court will appoint a special master to ascertain said amount.